[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 229 
The complaint is for freight charges of $618.53. The answer is a counterclaim for $114,880.73. The counterclaim, dismissed at the Trial Term, was sustained by the Appellate Division. Interest charges brought the judgment in favor of the defendant to $168,701.12. The facts are not in controversy. The defendant switched cars within its plant under an agreement that the service would be compensated by an allowance from the published rates. The validity of that agreement is the question to be determined.
In 1887 the defendant, General Electric Company, acquired a plant in the city of Schenectady. There were eleven acres of land and two buildings. The plant was close to the tracks of two railroads, the Delaware and Hudson, and the plaintiff, the New York Central Railroad. A siding ran from the tracks of the Delaware and Hudson into the plant and between the two buildings. Inbound and outbound freight transported over the plaintiff's road was carried over the siding. The Delaware and Hudson charged the defendant for this service $1 per car, and the defendant, upon making the payment, was reimbursed by the plaintiff. Those conditions *Page 231 
continued till 1892. The plaintiff then laid a spur track of its own, and freight to and from the plant was transported over the spur without extra cost to the defendant. In placing the cars within the plant to be loaded and unloaded, the plaintiff had the benefit of a steam locomotive acquired by the defendant in 1891 for use between its buildings. The defendant insisted that for this service it was entitled to some allowance. Writing to the plaintiff in March, 1894, it said: "The ground upon which we make claim for this allowance is that by the maintenance of our freight yards at Schenectady, we relieve you of the necessity of increasing your terminal facilities here, and moreover, we maintain a switching engine of our own, thereby relieving you of considerable extra labor which is customary for Railroad Companies to perform for consignees. In addition to this also, we load and unload all of our own freight, so that practically you do not have to bear the ordinary expenses of a terminal on business delivered to us." The plaintiff yielded to this claim. An agreement was made for an allowance of one cent per one hundred pounds (or 20 cents per ton) "on all incoming and outgoing business, to cover cost of switching and loading and unloading the freight." This agreement was modified in 1904 by excluding enumerated commodities, and otherwise has remained unchanged. Since 1904 the plaintiff has transported its cars to and from agreed storage tracks which are within the defendant's yard. Two of the tracks are known as equipment and two as interchange tracks. The incoming cars are taken by the defendant from these storage tracks, distributed among its buildings and unloaded. The outgoing cars are brought to the storage tracks by like agencies. At those tracks the plaintiff's services end for freight delivered and begin for freight received.
It is the work thus done by the defendant for which compensation is demanded. The plant which began in 1887 with eleven acres and two buildings, now covers 180 *Page 232 
acres, contains 140 buildings, and employs 15,000 men. Within this area, the defendant has laid twelve miles of standard gauge tracks. They run along the sides of the plant and between the buildings. Six standard gauge electric engines are used by the defendant in moving cars upon these tracks; five by day and one by night. At times seven engines have been used. There are also seven miles of narrow gauge track, and nineteen motors, employed in shifting material between the storehouses, shops and mills. All these tracks, the standard and the narrow gauge alike, cross one another at many points within the plant. Freight is loaded and unloaded at not less than eighteen separate buildings. About 100 cars enter the plant daily, and as many more leave it. The movement of these cars would be impossible without a co-ordinated system. The plant is accordingly divided into sections, and to each a separate engine is assigned. To do the work safely and expeditiously, these engines must be in constant use. In that way cars are moved from the platforms as soon as loaded or unloaded, transferred to the storage tracks, and made to give way to other cars which promptly take their places. Thus the men are kept at work every hour of the day, and waste of labor is avoided. There is constant activity, day and night. The cars on the storage tracks must be sorted, distributed to their proper buildings, shunted, switched, loaded, unloaded and returned. Other cars must distribute raw material and partly manufactured products among the appropriate shops and mills and storehouses in the vast system. To do this with safety and with order, the movement of all cars upon the interlacing lines within the plant must be subject to a single supervision. There is, therefore, a transportation master, who is one of the defendant's employees. The finding, well supported by the evidence, is that "the successful and economical prosecution of the business of the defendant requires that all such internal movements of cars, *Page 233 
whether standard or narrow gauge, in and about its plant, should be under the direction and control of the defendant."
As early as 1903 the plaintiff had some misgiving about the legality of the deduction from its rates. It wrote in April, 1903, that the arrangement must be a tentative one and subject to readjustment on notice — "this on account of the fact that we are now confronted by the Elkins Bill, under the provisions of which we are not exactly clear as to what can or cannot be done." In 1905 the plaintiff was indicted in the United States District Court for the Northern District of New York on the ground that the allowance was an unlawful rebate. Two juries disagreed, and the indictment was finally dismissed. After the finding of the indictment the plaintiff gave notice to the defendant in November, 1905, that it would make no further payments, and none have since been made. Soon afterwards Congress passed the act of June 29, 1906, commonly known as the Hepburn Act, which provides: "If the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the service so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for in this section." Under this section of the act the defendant in July, 1907, filed a petition with the Interstate Commerce Commission. It set out the rendition of service in switching and moving cars about its plant, alleged that these services were a part of the carrier's work of transportation, and asked the Commission to fix its compensation. On June 29, 1908, the Commission dismissed *Page 234 
the petition (General Electric Co. v. N.Y.C. H.R.R.R. Co.,
14 I.C.C. 237). The ruling was that the service rendered by the petitioner, the present defendant, was not part of the transportation undertaken by the carrier. Its instrumentalities were characterized as plant facilities. In this action, begun in 1910, the defendant has litigated anew the matters in controversy before the commission in 1908. It does not claim compensation for the movement of material along the narrow gauge system. It concedes this to be a plant facility. It insists, however, that an allowance must be made for the movement of cars from the storage tracks to points within the plant where they are loaded or unloaded, and for their subsequent return. There is a finding that 72% of the total car movements within the plant are necessary for that purpose. Other operations, even on the standard gauge tracks, are excluded from the claim. That the charge of one cent per hundred pounds is reasonable in amount is not disputed. The sole question is whether any charge is lawful. The trial judge in a careful opinion followed the ruling of the Interstate Commerce Commission, and held that the allowance was in effect an unlawful rebate. The Appellate Division reversed, and gave judgment on the counterclaim.
Transportation includes delivery. Under the plaintiff's published tariffs it does not include the work of loading and unloading (Official Classification, 38, Interstate CommerceCommission). But whatever is essential in order to complete delivery, the carrier must do. That is what it is paid for when it collects its regular rates. If it fails to make delivery, and the consignee through its own instrumentalities completes the work, an allowance is due (Interstate Commerce Commission v.Dieffenbaugh, 222 U.S. 42; United States v. B. O.R.R.Co., 231 U.S. 274, 293). But no allowance is due for service rendered by the consignee after delivery has been made *Page 235 
and transportation is at an end. An allowance in such circumstances would constitute an unlawful rebate. That is true of interstate shipments under the laws of Congress (Act to Regulate Commerce [Feb. 4, 1887], 24 Stat. L. 379, §§ 2, 3, 17; Act of Feb. 19, 1903, 32 Stat. L. 847; Act of June 29, 1906, 34 Stat. L. 584). It is true of intrastate shipments under the laws of New York (Public Service Commissions Law [L. 1907, ch. 429], §§ 31, 32).
The decisive question must, therefore, be whether the switching done by the defendant within its plant between the storage tracks and the platforms of its mills is work that the plaintiff was bound to do as a part of transportation. To put it in another form, the question is, where does transportation begin and end? The published tariffs to Schenectady establish switching limits extending from Sandbank to Carmen and Stony Lane. Delivery within those limits is paid for when rates are collected to Schenectady. Since the limits embrace the defendant's plant, there is no dispute that delivery at the plant is covered by the rate. The difficult thing is to ascertain when delivery at the plant is made.
In the nature of things no inflexible formula can furnish a solution of that problem. The limits of place within which delivery is due, will vary with varying conditions (MitchellCoal Coke Co. v. Penn. R.R. Co., 230 U.S. 247, 263). All that we can safely say is that there must be such a delivery as is customary and reasonable. There was a time, before the days of railroads, when a carrier by land was expected to make delivery at the consignee's home or place of business. That was because he could go there with his wagons (Fenner v. Buffalo State LineR.R. Co., 44 N.Y. 505, 510). With the days of railroads, delivery came to be expected at freight houses or other terminals. They are still the place of delivery where the factories and warehouses of shippers and consignees do not connect with the tracks. In our own time, however, private sidings have become common, and *Page 236 
freight is carried over them between the railroad and the plant. Such carriage is commonly a part of the work of transportation (Vincent v. Chicago Alton R.R. Co., 49 Ill. 33; Coe v.L. N.R.R. Co., 3 Fed. Rep. 775). In most cases the distances are short and the carrier's burden remains substantially the same whether the cars are left upon the siding close to the main tracks or hauled along the siding until they reach the plant. In such circumstances it may be said with reason that delivery at the plant means delivery at the platform for loading and unloading. The practice of hauling cars to points along the spur convenient to shipper or consignee is known as "spotting" and is commonly and fairly regarded as part of the work of carriage.
The plaintiff has not withheld from the defendant the services incidental to carriage between the railroad and the plant. It has hauled the cars from the main line to storage tracks within the limits of the defendant's yard. Those storage tracks correspond to the spurs or sidings on which the practice of "spotting" had its origin. But the defendant asks us to say that hauling the cars to storage tracks is not complete delivery. It insists that the plaintiff must haul them farther over an intricate system of interlacing tracks and distribute them among the mills and warehouses. One building is used for shipments of street car motors, another for slate and marble, another for pipe and copper, another for sand, coal and fuel oil, another for pig iron, coal and coke, another for wire and cable; others are used for other specific purposes; and still others for miscellaneous freight. The defendant says that the distribution among these buildings must be made by the plaintiff without extra charge in fulfillment of its duty of delivery under a contract of transportation.
We come back then to the test, which, vague as it is, remains the only safe one, and we ask ourselves whether, in the light of all the circumstances, such a form of delivery is customary or reasonable. That it is not customary *Page 237 
is established, we think, by uncontroverted evidence. "Spotting" cars upon short and direct sidings is a service that has little kinship to these intricate manoeuvres designed not to reach an industry, but to promote the convenient distribution of wares among the subdivisions of an industry. The difference may be one of degree, but here, as so often in the law, such differences are vital (Rideout v. Knox, 148 Mass. 368; Continental Sec. Co. v. N.Y.C. H.R.R.R. Co., 217 N.Y. 119, 125). We find, accordingly, that whenever these complicated shifts and transfers are made by shippers or consignees within their own plants, they are made at their own cost and without allowance from the carrier. That is true of the plant of the American Locomotive Works, the only other plant at Schenectady which involves these intramural operations. It is true of the plant of the Solvay Process Company at Syracuse. It is true of the plant of the Fleischmann Company at Peekskill. It is true of many other plants enumerated in the record.
The defendant's standard of delivery does not conform, therefore, to the standard of custom. We think it fails also when we test it by the standard of reason. A railroad's duty to carry is a duty to carry over its right of way. Private sidings, owned and maintained by shippers, do not constitute the right of way, and the use that the carrier may be compelled to make of them is subordinate and incidental to the fulfillment of its primary function of carriage along its route. Reasonable delivery may involve trifling departures from the route, as where the carrier's engines, after switching cars upon a siding, move them a short distance to the doors or platforms of a factory. Industrial spurs, within the switching limits designated by the carrier, are to be regarded, indeed, for many purposes, as an extension of the terminals (Los Angeles Switching Case,234 U.S. 294). But reasonable delivery does not involve the carrier's co-operation in the division of labor and of functions *Page 238 
between the sections of a gigantic plant. This network of tracks is and must be under unified control. Order and method must reign. Conflict between engines on the standard tracks and those on the narrow tracks, must be avoided. Engines hauling cars for loading or unloading must not collide with engines hauling cars for other and unrelated purposes. The coming and going of cars must be accommodated, not to the exigencies of railroad operations, but to the centralized administration of all the parts of a vast and interdependent industry. If the plaintiff attempted to distribute its cars immediately upon arrival, and sent its engines into the streets that interlace the defendant's plant, it would in effect take possession of the works, and put the defendant out of business. That is conceded, indeed, in one of the opinions at the Appellate Division. The defendant has been able to distribute freight throughout its plant, without suspending its business and without peril to its 15,000 workmen, by the use of engines, not at irregular hours, but constantly, day and night; by subordinating the use of its tracks to the needs of a unified scheme and the dominion of a single will. All this the defendant may properly do, because that is its business. It cannot put that burden, however, upon the carrier. To adopt and maintain this elaborate system of operations on the defendant's private tracks is not to add a minor incident to carriage along the plaintiff's right of way. It is to subordinate the operation of the business of the carrier to the needs, the economies, the internal administration of the business of the shipper. The engines that move within this plant are not doing work that the plaintiff ought to do, or effectively could do. They are doing the defendant's work. They are "plant facilities."
This distinction between the instrumentalities of transportation and those of internal management was drawn by the Interstate Commerce Commission when the defendant's petition for an allowance was before it *Page 239 
(General Electric Co. v. N.Y.C. H.R.R.R. Co., 14 I.C.C. 237). It has been maintained in many other cases. In SolvayProcess Co. v. D., L. W.R.R. Co. (14 I.C.C. 246) it was applied to the switching of cars within the plant of the Solvay Process Company. In Crane Iron Works v. C.R.R. Co. of N.J. (17 I.C.C. 514) it was applied to like operations within the plant of the Crane Iron Works. The order of the Commission in that case was affirmed by the Commerce Court (Crane v. U.S.,
209 Fed. Rep. 238, 242); and the distinction drawn by the Commission in the General Electric case and the SolvayProcess case "between those operations which constitute a plant facility and the legitimate functions of a common carrier" was said "to express a sound and wholesome principle." In theIndustrial Railways Cases (29 I.C.C. 212, 230; 34 I.C.C. 596, 601) the Commission reaffirmed its previous rulings, and pointed out (29 I.C.C. at 235) that they were in harmony with the prevailing practice in England and in Germany (See also: KaulLumber Co. v. C. of G. Ry. Co., 20 I.C.C. 450, 455; Mfrs. Ry.Co. v. St. L., M. S. Ry. Co., 21 I.C.C. 304, 315; Chicago Alton R.R. Co. v. U.S., 156 Fed. Rep. 558).
We do not have to limit ourselves, however, to the decisions of the Commission and the Commerce Court. We find the same distinction between plant facilities and true agencies of transportation in the decisions of the Supreme Court. Sometimes the application of the distinction by the Commission has been disapproved, but always the validity of the distinction has been assumed, and the General Electric and Solvay Process cases have been cited to illustrate its meaning. This was done in theTap Line Cases (234 U.S. 1, 23). DAY, J., writing for the court, explained the meaning of plant facilities by reference to the General Electric and Solvay Process cases, and commenting on them, said: "These systems of internal trackage were not common carriers, and, however extensive, were *Page 240 
intended to and did furnish service for the plants which owned and operated them." (See also opinion of the Commerce Court in that case, 209 Fed. Rep. 244, 257). Again, in the Los AngelesSwitching Case (234 U.S. 294, 310), HUGHES, J., writing for the court, said that the receipt and delivery of goods at plants located upon spurs or side tracks was sometimes a distinct service; and distinguished from the case before him "cases of an interior movement of plant traffic to and from various parts of the establishment, and of deliveries through a system of interior switching tracks constructed as plant facilities." (234 U.S. at 310). Spur tracks, which though leading to a single plant, are in reality terminal facilities (234 U.S. at 310), are subject to one rule; spur tracks, which are in reality plant facilities, are subject to another.
The law has attempted "to shut the door to all contrivances in violation of its provisions against preferences and discriminations" (Southern Ry. Co. v. Prescott, 240 U.S. 632,638). The door to all those abuses would be opened if a railroad could be made without extra charge to participate at its own expense in the internal management of the business of shippers and consignees. It is no answer to say that the maintenance of the storage tracks relieves the carrier of the necessity of increasing its own terminal facilities, which would be insufficient in their present form to accommodate the defendant's traffic. That is true, in greater or less degree, of every siding along the route. The carrier is helped because the factories are near the tracks. It is not bound to counterbalance the benefit by assuming expenses that normally would fall upon the customer. The Supreme Court, speaking of the Interstate Commerce Law, has said that it "does not attempt to equalize fortune, opportunities or abilities" (Interstate Commerce Comm. v. Diffenbaugh,222 U.S. 42, 46). That is as true when fortune and opportunities help the carrier as it is when they help the shipper. *Page 241 
We are asked in the opinion of the Appellate Division whether it can be "the policy of the nation to prevent the most economical production of manufactured goods, or to compel the defendant to cart its vast shipments from cars placed upon the plaintiff's own sidetracks remote from defendant's works." The assumed alternative is an unreal one. The question is not whether switching within the plant shall cease. The question is, who shall pay for it. To compel the plaintiff to pay by deduction from the regular rates for any service not a part of transportation is to prefer the defendant over others (ArmourPacking Co. v. U.S., 209 U.S. 56, 72). It is not the policy of the nation to place useless clogs upon commerce, but it is the policy of the nation that preferences shall be impossible.
The defendant makes the point that a recovery should in any event be allowed for services rendered in connection with intrastate shipments. This clearly is not so of shipments made since the enactment of the Public Service Commissions Law. But we think there can be no recovery even for earlier shipments (Root
v. L.I.R.R. Co., 114 N.Y. 300). The defendant cannot build its rights upon the contract, for the contract did not fix the term of its duration, and the plaintiff has canceled it. If the defendant can recover at all, even for intrastate shipments, the basis of the recovery must be a quantum meruit. But, to warrant a recovery upon that basis, the work done by the defendant must be work which ought to have been done by the plaintiff as part of the task of carriage. We have already stated our reasons for the conclusion that this was not the true nature of the service. There is nothing, therefore, on which to build the implication by law of a promise of reimbursement.
Other objections to the counterclaim have been argued by the plaintiff. The point is made that the allowance, if otherwise legal, ought to have been published (Mitchell Coal Coke Co. v. Penn. R.R. Co., 230 U.S. 247 *Page 242 
261), and that the ruling of the Interstate Commerce Commission dismissing the defendant's petition is conclusive until annulled. The determination of those questions is not necessary in the disposition of this appeal.
The judgment of the Appellate Division should be reversed and that of the Trial Term affirmed, with costs in the Appellate Division and in this court.
WILLARD BARTLETT, Ch. J., CHASE, COLLIN, CUDDEBACK and POUND, JJ., concur.
Judgment reversed, etc.