**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**B. I. HOLSER AND COMPANY and Cargill, Inc.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**ARGOS ELEVATOR, INC. and Cargill, Inc.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**ARGOS ELEVATOR, INC. and Central Soya Company, Inc.**

v.

**CENTRAL STATES GRAIN CO., INC.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**B. I. HOLSER AND COMPANY and Continental Grain Company (two cases).**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**WYATT GRAIN CO., INC. and Central Soya-Canton Elevator.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**ARGOS ELEVATOR, INC. and Indiana Grain Division, Indiana Farm Bureau Cooperative Association.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**ARGOS ELEVATOR, INC. and Central States Grain Company, Inc. and Continental Grain Company.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**WYATT GRAIN COMPANY and Indiana Grain Division, Indiana Farm Bureau Cooperative Association.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**B. I. HOLSER AND COMPANY and Continental Grain Company.**

**NORFOLK & WESTERN RAILWAY COMPANY**

v.

**ARGOS ELEVATOR, INC. and Continental Grain Company.**

Nos. S 77–7, S 77–8, S 77–23 to S 77–25, S 77–32 and S 77–110 to S 77–114.

United States District Court, N. D. Indiana, South Bend Division.

March 7, 1979.

Crumpacker, May, Searer, Oberfell & Helling, South Bend, Ind., for plaintiffs in all cases.

Linley E. Pearson, Frankfort, Ind., for plaintiffs in Nos. S 77–7, S 77–8, and S 77–110 to S 77–114.

Roland Obenchain, South Bend, Ind., for plaintiffs in Nos. S 77–7 and S 77–8.

James E. Easterday, Plymouth, Ind., for defendants in Nos. S 77–7 and S 77–8.

Lawrence C. DiNardo, South Bend, Ind., for defendants in Nos. S 77–7, S 77–8, S 77–23, S 77–32 and S 77–113.

Campbell, Hardesty, Pearson & Douglas, Frankfort, Ind., for plaintiffs in Nos. S 77–23 to S 77–25.

David H. Feagler, Plymouth, Ind., for defendants in Nos. S 77–23 to S 77–25, S 77–113 and S 77–114.

John E. Doran, South Bend, Ind., for defendants in Nos. S 77–23, S 77–111 and S 77–114.

Karl Richard Hawley, Mount Vernon, Ind., Richard D. Bonewitz, South Bend, Ind., for defendants in Nos. S 77–24, S 77–25, S 77–111, S 77–113 and S 77–114.

Larry R. Fisher, Lafayette, Ind., for plaintiffs in Nos. S 77–32 and S 77–112.

Joseph A. Roper, DeVere D. Goheen, South Bend, Ind., for defendants in Nos. S 77–32 and S 77–112.

John D. Bodine, Mishawaka, Ind., for defendants in Nos. S 77–110 and S 77–112.

MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This will state the legal basis for separately entered findings of fact and conclusions of law.

These cases were consolidated for trial by agreement of the parties. Trial was had only on the issues raised by plaintiff's complaints. The issues raised by defendants' affirmative defenses, and cross-claim were postponed. The cases involve shipments of grain from three elevators adjacent to plaintiff's railroad; B. I. Holser & Company, at Walkerton, Indiana, Argos Elevator, Inc., at Argos, Indiana, and Wyatt Grain Co., Inc., at Wyatt, Indiana. Each of the suits are brought to recover additional freight charges allegedly owing for grain shipped from the three local elevators from 1972 to 1976, to the East coast, the other defendants being the named consignees of the various shipments. It is claimed that the elevators in question cannot take advantage of the lower "10 car rate", but rather must use the higher "5 car rate."

The limited portion of these cases now before the Court depends upon the interpretation placed upon the switching restrictions in the applicable tariff (Item 7020.6) which was added and made effective in May, 1971. Before 1971, there was in effect a 15-car rate from the points in question (Walkerton, Argos and Wyatt) which contained no switching restrictions. It can be assumed that the only reasonable basis for adding a switching restriction to the tariff would be to reduce operating costs to the railroads. The railroads, in theory at least, would deliver one group of ten cars to the elevator and remove one group of ten cars from the elevator, thus saving the expense of providing an engine and switch crew for more than one movement of hopper cars to the shipper's facility.

A practical effect of the switching restriction is to prevent the use of the rate in question by any country elevator that cannot receive at least 10 hopper cars on its siding. The freight cost is an integral part of the price that can be paid to the producer. Therefore, those small elevators that could not take advantage of the 10-car rate could not pay the farmers as much for their grain as could 10-car shippers; and thus smaller elevators were put at a competitive disadvantage. They seem to favor trainload units that can be put together by larger shippers. There may be more than one reason for this. As Rodman Kober testified, in the case of his company, it owns or leases its own tracks at all points from which trainload units are shipped. This arrangement not only allows railroads certain economies of scale, but also shifts the burden of side or loading track maintenance and construction to the shipper.

In the case of the smaller country elevators such as B. I. Holser & Co., Argos Elevator and Wyatt Grain, the sidetracks available to them were, in the most part, built many years ago, and used by the elevators by common consent with the railroad owner without the imposition of a lease or of a track maintenance or operating agreement. The only apparent exceptions were track leases covering 50-foot strips, executed to allow elevators to hold or store a private fertilizer car on the leased track portion for an extended period without demurrage. When Wyatt Grain more recently wanted to expand its operation, the additional trackage was constructed at the expense of Wyatt Grain. Other than the Wyatt extension, the evidence is clear that the sidetracks serving these elevators had been used by the adjacent elevators for many years; the railroad has never demanded a lease agreement; and presumably the line-haul rate itself included the cost of sidetrack maintenance and operation.

After publication of the 10-car rate, each of the three elevators shipped 10-car units, beginning in 1972 and ending in 1976 when the railroad refused further 10-car shipments. The only evidence in the record concerning cases of this refusal is defendant's, Central Soya, Exhibit U which is a letter from L. E. Caldwell of the N & W to a Mr. G. W. Fisher which relates the visit of an I.C.C. inspector, a Mr. Hoover. There is no evidence in the record as to what prompted Mr. Hoover's investigation. According to this letter, Mr. E. H. Steward (plaintiff's expert witness) concurred with the I.C.C. inspector, and N & W stopped accepting 10-car shipments from Walkerton, Argos and Wyatt.

Mr. Kober's uncontradicted expert testimony was that N & W was and is not required to accept the opinion of this I.C.C. inspector and could have litigated the matter in court or before the I.C.C. There is evidence from Mr. Kober that the matter never apparently went beyond the lowest level at the I.C.C. The N & W filed a special docket application with the I.C.C. on or about January 7, 1977, which was designated S.D. No. 241760, for the purpose of securing a waiver of any undercharges including those now before this Court. The railroad did not pursue the special docket application (which of necessity would have been based on some confession or error by N & W), did not file any justification, and withdrew the special docket application prior to its filing the present cases.

*Walkerton.* The plaintiff introduced in evidence a plat showing the location of the main track and sidetracks at the B. I. Holser & Company elevator at Walkerton. The track marked in red was at first referred to as the "passing track" by plaintiff's witness, although on cross examination he conceded that only the area between points "C" and "D" could properly be referred to as a "passing track" and the area between points "A" and "C" could more properly be called the sidetrack. The evidence showed that the length of a covered hopper car is 60 feet. The distance between point "A" and point "C" is 958 feet. There is another sidetrack beginning at point "B" which appears from the plat to be approximately 250 feet long. Virginia Street, which is 20 feet wide, and Georgia Street, which is 24 feet wide, cross these sidetracks. Even assuming that the railroad could and did comply with its own operating rules and not place a car within 50 feet of either side of a street, it is obvious from the evidence that more than 10 railroad hopper cars can be placed on the sidetrack between points "A" and "C".

The distance between point "A" (the end of the sidetrack) and point "B" (the loading spout of B. I. Holser & Company) is 279.5 feet. Ten cars cannot be loaded *from the spout* without some shifting or moving of cars.

The evidence from Holser's witness, Richard Soper, is that during the entire time he was manager of Holser, the company used the entire sidetrack shown between points "A" and "C" without objection from the railroad, and at no time did the railroad demand that Holser execute a lease on this sidetrack as a condition of Holser's use. There is no evidence from the railroad that any such demand had ever been made.

*Argos.* The plaintiff's plat of the Argos track shows that the distance between point "B" (the derailer) and point "E" (the end of the sidetrack) is 1714 feet. This entire distance is shown on plaintiff's exhibit as being the elevator's sidetrack. There is testimony that one or two other businesses made very occasional use of this sidetrack. Again it is obvious from the evidence that more than 10 covered hopper cars can be placed on this sidetrack, although 10 cars cannot be loaded on the sidetrack from the elevator's spouts without shifting the cars.

The testimony of Argos' witness, William Metzger, shows that Argos Elevator has been using this sidetrack for at least 22 years without objection from the railroad, and that the railroad has never demanded that a lease be executed. There is no evidence from the railroad of any such demand.

*Wyatt.* The Wyatt survey shows that this facility consists of the north elevator and the south elevator. The south elevator is located in the southwest corner of land leased from the railroad, adjacent to the south sidetrack. That portion of the south sidetrack which is west of State Road 331 (which runs north and south) is denominated "Lumber Company Spur," and that portion of the siding east of State Road 331 is called simply "Switching Track." Immediately north of the "Switching Track" portion of the siding is another siding denominated "Old Passing Track." North of these two sidings is the main track of N & W.

The north elevator of Wyatt Grain is located in the northeast part of the total facility shown on the survey, immediately adjacent to another siding which is commonly referred to as the north switching track.

There are four industries located along the Lumber Company Spur and South Switching Track, those industries being (from west to east) Wyatt Lumber and Coal Company, Wyatt Grain, Smith-Douglas (Borden), and the coal operation of Wyatt Lumber and Coal Company. Since approximately 1917, Wyatt Lumber Company has leased the land west of the highway and south of the main railroad track from N &

W for use in that shipper's lumber business. By agreement with N & W, the lumber company extended the track west of the highway at its own expense in order to serve its needs. This is the portion of the track denominated "Lumber Company Spur" on N & W's survey. Wyatt Grain has had the use of this spur for the purpose of loading and assembling shipments of grain continuously since 1919. The use of this spur has been with the full knowledge and consent of N & W and Wyatt Lumber Company.

Regarding that portion of the south switching track running easterly from State Road 331, approximately 450 feet is situated on railroad land immediately adjacent to the Wyatt Grain south elevator. The remaining portion (eastward to termination) is situated on railroad land immediately adjacent to railroad land leased to Smith-Douglas (Borden) and Wyatt Lumber. The maintenance of the south switch track has been performed by the industries located thereon. No maintenance of the track by the railroad is known to have taken place for at least 25 years. The industries located on the south switch track have used that track for the loading, unloading and assembly of cars to be transported by N & W, for which shipments the industries have paid the appropriate line-haul charges made by N & W in accordance with its published tariffs.

As shown on the survey, the north elevator is located immediately adjacent to the north switching track. The north switching track extends for some 845 feet from N & W's main track westerly to a stub end west of the north elevator. The north track is subject to a siding agreement between the Railroad and Wyatt Grain. The north track was installed and ready for use commencing in 1968. In about the year 1971 N & W informed Wyatt Grain that it was entitled to use the ten-car rate. Since a hopper car is approximately 60 feet in length, substantially more than ten cars can be placed on both the north and the south switching tracks, taking into account the Lumber Company Spur and the permissive use made thereof by Wyatt Grain. A total of approx-

imately 23 or 24 hopper cars can be placed on these sidings at any one time. Approximately 13 cars can be located on the 845 feet of siding of the north sidetrack and approximately 10 or 11 cars on the south switching track. In addition, the evidence showed that at the Wyatt facility, if 10 cars were delivered at one time, 6 cars could be loaded from the spout at the north elevator and 4 cars could be loaded from the spout at the south elevator.

\* \* \* \* \* \*

In actual practice, it appears from the evidence that although all three elevators consistently ordered 10-car units in accordance with the tariff, 10 cars were seldom, if ever, supplied by N & W as one unit to the shipping elevators involved in this case. The cars to comprise the 10-car units would arrive piecemeal and would be loaded as they arrived. When the 10 cars had been finally loaded, they would be moved by N & W as a unit on one bill of lading. The evidence shows that as the hopper cars arrived at each elevator, the railroad did, in fact, perform more than one switching operation, contrary to the tariff provisions, but that this was not done at the request of the local elevator operators. The local elevator operators and even Mr. Cummins, N & W's local agent, were not aware of any switching restriction in the tariff. The evidence further establishes that none of the purchasers of 10-car units of grain from the three local elevators were aware of, at the times of purchase, these elevators' physical components.

This case turns on the proper interpretation of the switching restriction that is a part of the applicable tariff. The switching restriction says:

"Rates will not apply when due to shipper's disability, assembly of shipment at origin requires originating line to switch more than one cut of empty cars to shipper's facility or more than one cut of loaded cars from shipper's facility or when due to consignee's disability, distribution of shipment at destination requires terminating line to switch more than one cut of loaded cars to consignee's

facility or more than one cut of empty cars from consignee's facility."

After the present cases were filed, N & W proposed to the General Freight Traffic Committee, a rail ratemaking bureau authorized under Section 5b of the Interstate Commerce Act, 49 U.S.C. § 10706, that a "clarification" be added to the tariff involved in this case, more particularly defining the meaning of the term "cut". This clarification became effective on July 1, 1978, and it says:

A "cut" is defined as a quantity (one or more) of cars delivered to or removed from the track or tracks of the consignor or consignee at origin and/or destination at one location at one time. Such cars may be spotted on, or pulled from, more than a single track.

Both the railroad and the defendants' witnesses testified at the trial that the clarification did not change the meaning of the term "cut" as originally intended in the switching restriction.

The railroad makes two arguments: (1) that the term "shippers facility" as used in the switching restriction itself and the term "track or tracks of the consignor" as used in the clarification refer to only those tracks either owned or leased by the shipper, and (2) in any event these shippers could not and cannot comply with the switching restriction because they could not and cannot load 10 cars at one time from the *loading spout* at their elevators without an additional switch.

The tariff provisions in question were drafted and promulgated by the plaintiff railroad with the concurrence of other railroads who are parties to the relevant tariff pursuant to 49 U.S.C. § 10762, which requires rail common carriers to publish all rates, fares and charges for transportation between points on their routes. Such tariffs, when properly published, have the force and effect of law. *P. R. R. v. International Coal Mining Co.*, 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1913). The railroad has a duty to express its intent in a tariff in clear and plain terms so that those referring to them may readily understand

their meaning and act accordingly. As the Court said in *Atlantic Coastline R. Co. v. Atlantic Bridge Co.*, 57 F.2d 654, at page 655 (5th Cir. 1932), the tariffs "may not be contrived in catchpenny terms to catch the ignorant and unwary. If they are ambiguous, or permit of two meanings, the shipper may construe them in the most favorable way to himself which the terms permit." This same principle has been followed by the I.C.C. for many years. For example, in *All Freight From Chicago, Ill., to the East*, 313 I.C.C. 638 (1961), the Commission said at page 640:

> It is a principle as old as the act we administer that, to avoid unlawful discrimination and prejudice, the rates and charges on a particular shipment must be readily ascertainable. Shippers should know in advance what rates they must pay.

One of the leading cases which sets forth these general rules of tariff interpretation is *Penn Central Company v. General Mills, Inc.*, 439 F.2d 1338 (8th Cir. 1971), in which the Court summarized these rules at pages 1340–41:

> First, where, as in this case, there is no issue of fact and the words of the tariff are used in their ordinary meaning with no particular connotation in the expert field of the Interstate Commerce Commission, then the interpretation of a tariff ordinarily presents a question of law. (Citations omitted).

> \*     \*     \*     \*     \*     \*

> Second, a tariff is no different from any contract. (Citations omitted).

> \*     \*     \*     \*     \*     \*

> Third, in interpreting a tariff, its terms must be taken in the sense in which they are generally used and accepted; and it must be construed in accordance with the meaning of the words used. (Citations omitted).

> \*     \*     \*     \*     \*     \*

> Fourth, the tariff should be construed strictly against the carrier, since the carrier drafted the tariff; and consequently, any ambiguity or doubt should be decided in favor of the shipper.

> (Citations omitted).

> \*     \*     \*     \*     \*     \*

> Fifth, such ambiguity or doubt must be a reasonable one and should not be a result of a straining of the language. And, there must be a substantial and not a mere arguable basis in order to justify resolving the doubt against the carrier. (Citations omitted).

> \*     \*     \*     \*     \*     \*

> Sixth, published rules relating to tariffs must have a reasonable construction and should be interpreted in such a way as to avoid unfair, unusual, absurd or improbable results. (Citations omitted).

> \*     \*     \*     \*     \*     \*

> And finally, a strict construction of a tariff against a carrier is not justified where such a construction ignores a permissible and reasonable construction which conforms to the intentions of the framers of the tariff, avoids possible violations of the law, and accords with [a] practical application given by shippers and carriers alike.

■ Where, as here, the railroad uses the term "shipper's facility" or the term "track or tracks of the consignor" in its tariff, the court should first determine whether these words carry a particular or peculiar connotation as a matter of commerce law as developed under the Interstate Commerce Act. In this case, there appears to be an interpretative conflict. The railroad's expert limited the meaning of these terms to tracks leased or owned by the three defendant shippers. The defendants' witnesses uniformly testified that these terms included not only leased and owned tracks, but also those sidetracks customarily furnished to or used by the shippers, especially where such practice has persisted for a long period of time. The construction placed on this language by the railroad is quite strained, particularly in the light of the fact that this meaning could easily have been spelled out with particularity in the tariff itself. If these terms are found to be ambiguous,

their meaning must be resolved against the railroad.

■ The plaintiff argues secondly that the defendant-consignors were laboring under a "shipper's disability" because in each instance 10 cars cannot be loaded under the loading spout at the elevators in question without a second switching movement. It is clear that in each instance 10 cars can be delivered to the sidetracks of the three elevator defendants in only one "cut" and one switching movement. At Wyatt, for example, 10 cars can be placed or delivered onto the leased track on the north or to the sidetrack on the south side which has been used for many years by this defendant. In fact, from the evidence it appears that Wyatt can load ten cars from the elevator spout, 6 from the north track and 4 from the south track, since under the plain language of the tariff, the cars may be spotted on or pulled from, more than a single track. In practice it appears that in almost all, if not all, instances, N & W delivered or switched only two to five cars at a time, although the defendant shippers had ordered units of 10 cars. The railroad, apparently on its own volition and without being requested to do so by the local elevators, did in fact deliver the cars in such a way that they were loaded from the elevator loading spout; and in the process actually delivered more than one "cut" of empty cars to the elevators. It appears from the evidence that this practice of N & W violated the terms of its own tariff; but apparently, at the time, the local elevator officials and even the local railroad agent were unaware of the switching restriction in the tariff. Where the local railroad, for its own operating convenience, furnishes less cars than are ordered, it cannot complain that this violates the tariff. *St. Louis Southwestern Railway Co. v. Spring River Stove Co.*, 236 U.S. 718, 35 S.Ct. 456, 59 L.Ed. 805 (1915).

■ There was uncontradicted testimony that had the railroad delivered 10 cars to the siding of these local elevators, they could have been loaded partly from the elevator spout and partly by the use of portable augers. The local elevator operators testified that it would be economically advantageous to them to use this dual method of loading if required to take advantage of the ten-car rate. From the viewpoint of the railroad, if 10 cars can be delivered to the facility with one cut of empty cars, and removed in the same manner, this satisfies the literal terms of the tariff. The railroad has no legitimate interest in specifying the *method* of loading. Of course, the method of loading is *not* specified in the tariff itself, and it would be unreasonable to read such language into it.

The record is replete with references to the persistent shortage of covered hopper cars for loading during the relevant period by the instant three shippers. In order to meet these shippers' demands for 10-car units despite a general inability to provide complete 10-car units for loading, N & W switched or placed portions of such units. Although these shippers should not be charged with any operating practice followed by N & W for its own operating convenience, whether in derogation of its tariff or not, the shippers' practice of immediately loading whatever cars (or incomplete units) were supplied by N & W was consistent with the Commission's policy as articulated in *Ormet Corp. v. Illinois Central R. Co.*, 341 I.C.C. 647 (1972). In *Ormet* the agency was confronted with the conflict between fostering greater car utility during a car shortage and tariff restrictions that require the loading of an entire unit of cars at one time by a shipper. In such circumstances, could a shipper refuse to load a requisite unit of cars until the railroad supplied the entire unit; or does the public interest in increasing car utility require the shipper's loading of portions of the requisite unit where the rail carrier is unable to supply more than a few cars at a time?

The Commission in *Ormet* required that a shipper who receives part of a requested multiple-car unit either must load and tender for shipment within the free time period allowed under the multiple-car rate or must suffer the imposition of applicable demurrage charges if the shipper chooses to wait for the complete multiple car unit to

be assembled at the shipper's facility. Its general policy premise is stated *supra* at 654–55:

> The Commission cannot and will not tolerate the unnecessary detention of cars which are vitally required elsewhere. The available equipment must be kept in service to the greatest extent possible. When the fleet is not used to capacity, there is a resultant loss of revenue to the carriers, a denial of needed service to the public, and a waste of the Nation's economic resources. Accordingly, each car must be made to produce its full measure of transportation.

■ The Commission concluded in *Ormet, supra* at 655 that a shipper would be entitled to the otherwise applicable multiple-car rate instead of single-car or any higher rate where the origin carrier is unable to furnish the full unit of cars required by the tariff if the shipper can show (1) it was in a position to take advantage of the lower multiple-car rate, (2) it timely ordered the necessary cars from the carrier, and (3) it was physically able to accept and load the cars ordered only to find the railroad unable to furnish the cars in sufficient number prior to commencement of demurrage on those cars placed first. The evidence shows no shipper's disability—rather, N & W's disability to supply complete 10-car units; and thus, each local elevator appears able to have taken advantage of the more economical 10-car rate had N & W supplied the full complement of cars. N & W has made no claim that any of the orders for 10-car was not timely made; and the documentary evidence on this point must be viewed, in the absence of any suggestion by N & W to the contrary, as establishing the timeliness of each car order. The last element of proof required by *Ormet* goes to the heart of the case in its present posture before this Court, and defendants submit that they have established each elevator's physical ability to accept and load 10-car units, within the plain meaning of the applicable tariff's terms, had they been provided by N & W as ordered. Therefore, the local elevator operators acted responsibly, as required by *Ormet*, in loading and tendering to N & W

segments of 10-car units as provided by the carrier for its own operating convenience regardless of the operating economies upon which the 10-car rates may have been predicated. *Cf., Louis Padnos Iron & Metal Co. v. Chesapeake and O.*, 352 I.C.C. 719 (1976). It is mere sophistry for N & W to argue that the tariff should be interpreted against these three elevators' use of the 10-car rate because the evidence clearly shows that N & W seldom, if ever, supplied a complete unit for loading.

■ Under the guidelines as set forth in *Penn Central, supra,* the terms "shippers facility" and "track or tracks of the consignor" include that section of sidetrack set aside for and/or customarily used by the local elevator. There is no requirement that these sidetracks be owned or leased by the local elevator.

■ If N & W were allowed to impose a lease charge for the use of the sidetracks in these cases, it would be collecting more money than is permissible under its published tariff. This is unlawful under the applicable statutes. The Interstate Commerce Act, 49 U.S.C. § 1, et seq., requires common carriers to provide "transportation", as therein defined, and to charge for such transportation services no more and no less than the published line-haul rates. *I. C. C. v. Atchison, T. & S. F. R. Co.*, 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319 (1914).

In *New York Central, etc. Ry. Co. v. General Electric Company*, 219 N.Y. 227, 114 N.E. 115, 1 A.L.R. 1417 (1916) the New York Court was faced with an analogous situation. In 1887 the General Electric Company had acquired 11 acres of land with two buildings near the plaintiff's railroad tracks. At the time of the decision the company owned 180 acres with 140 separate buildings, employing 15,000 people, and had laid 12 miles of standard gauge tracks on its own property. About 100 railroad cars per day entered the plant premises, and were delivered, by the company, to various of the buildings for loading or unloading. The company claimed that it was the obligation of the railroad to deliver the cars to the

various buildings under its published tariff, and if the company did this work an allowance from the published tariff should be made.

In his opinion, Judge Cardozo outlined briefly the history and purposes of the Interstate Commerce Act, the Elkins Act and the Hepburn Act. Then he said:

"Transportation includes delivery. . . whatever is essential to complete delivery, the carrier must do. That is what it is paid for when it collects its regular rates." 114 N.E. at 117.

Later in the opinion the Court went on to say:

"The decisive question must therefore be whether the switching done by the defendant (GE) within its plant between the storage tracks and the platforms of its mills is work that the plaintiff was bound to do as a part of transportation. To put it in another form, the question is, Where does transportation begin and end? The published tariffs to Schenectady establish switching limits extending from Sandbank to Carmen and Stony Lane. Delivery within those limits is paid for when rates are collected to Schenectady. Since the limits embrace the defendant's plant, there is no dispute that delivery at the plant is covered by the rate. The difficult thing is to ascertain when delivery at the plant is made.

"In the nature of things no inflexible formula can furnish a solution of that problem. The limits of a place within which delivery is due will vary with varying conditions. (Citing cases) All that we can safely say is that there must be such a delivery as is customary and reasonable. . . ." 114 N.E. at 117.

The court went on to hold that the "delivery" required under the law did not include complicated movements of cars and switching on the company's premises, but that the published tariff did include delivery of the cars from the main railroad onto the company's sidetrack. For such delivery the railroad can charge no more, and no less, than the published rate. 49 U.S.C. § 6(7).

In *Ex Parte 104, Practices of Carriers Affecting Operating Revenues or Expenses, Part II, Terminal Services,* 209 I.C.C. 11 (1935), the commission, on its own motion, had made a general investigation of the terminal practices of railroads. In its discussion of the applicable law (page 20) it said:

"Section 1(3) of the Interstate Commerce Act defines 'transportation' to include all services in connection with the receipt and delivery of property transported, and paragraph 4 of the same section makes it the duty of common carriers to provide such transportation upon reasonable request therefor at just and reasonable charges."

Later in its opinion (page 33) the Commission set forth a portion of Section 6(7) of the Act, 49 U.S.C. § 10761 as follows:

(No carrier shall) "charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property or for any service in connection therewith, between points named in such tariffs, than the rates, fares and charges which are specified in the tariff filed and in effect at [that] time."

The general thrust of the above case is that under the law the railroads cannot charge *less* than the published line-haul rate for *delivery,* of freight. Clearly, under the law, the railroad cannot charge *more* than the published line-haul rate for delivery of the empty railroad cars at the sidetrack for loading. One of the latest and most explicit definitions of the carriers' duty is contained in *U. S. Dept. of Defense v. Northern Pacific Ry.,* 309 I.C.C. 691 (1960) at 694:

"The line-haul rate is generally recognized as obligating a carrier to provide a freight car, a proper place at which to load it, the conveyance of that loaded car, and its terminal delivery."

The railroad now argues that the "ten-car rate" is not applicable unless and until the local elevators at Argos, Walkerton and Wyatt pay some unspecified additional charge for the use of the sidetracks in question. Such a charge is not included in the

published tariff, and even if it was, it would be discriminating and unlawful.

The defendants are and at all times were entitled to ship grain using the "10 car rate".

Judgment should be entered for the defendants on the issues now before this Court.

This Court is well aware of the admonition that a district court should not routinely adopt findings and conclusions submitted by the prevailing party. In this case those findings and conclusions have been carefully and fully reviewed and found to be most adequate. To make changes in regard to same would be to do so for the sake of change alone. This Judge deems it unnecessary to make any changes in same.