62 F.3d 259
 Kenneth IVERSON, Appellant/Cross-Appellee,
v.
SOUTHERN MINNESOTA BEET SUGAR COOPERATIVE, a Minnesota
cooperative, doing business as Southern Minnesota
Sugar Cooperative, Appellee/Cross-Appellant.
 Nos. 94-3588, 94-3707.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1995.
Decided Aug. 10, 1995.
 
 Eric J. Magnuson, Minneapolis, MN, argued (David F. Fitzgerald and Stephen O. Plunkett, on the brief), for appellant.
 George G. Eck, Minneapolis, MN, argued (Andrew J. Cohen, on the brief), for appellee.
 Before BEAM, Circuit Judge, BRIGHT, Senior Circuit Judge, and MURPHY, Circuit Judge.
 MURPHY, Circuit Judge.
 
 
 1
 Kenneth Iverson appeals from the judgment of the district court[1] dismissing his claims brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. Secs. 51 et seq., seeking damages for injuries he sustained while employed by Southern Minnesota Beet Sugar Cooperative (SMSC) as a switchman for its in-plant rail yard. SMSC cross-appeals from the district court's denial of its motion for sanctions.[2] We affirm.
 
 
 2
 Congress enacted FELA in response to the special needs of railroad workers who are exposed to daily risks inherent in their work. See Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610 (1943). The statute imposes broad liability on railroads to provide compensation for on-the-job injuries sustained by their employees, but its application is explicitly limited to railroads that function as common carriers. Section 1 of FELA provides in part:
 
 
 3
 Every common carrier by railroad while engaging in commerce between any of the several States ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier....
 
 
 4
 45 U.S.C. Sec. 51. The question presented on this appeal is whether SMSC is a common carrier by railroad subject to liability under FELA.
 
 I.
 
 5
 SMSC is a beet sugar processing cooperative that operates a rail yard at its Renville, Minnesota factory. The rail yard, which includes nearly five miles of railroad track, lies within the factory's one square mile of property. At the time relevant here, the Soo Line Railroad Company (Soo Line) provided interstate transportation for commodities shipped to and from the factory.[3] SMSC's yard tracks were connected to the Soo Line tracks by spur tracks on the east and west ends of the property. Soo Line owned the sections of the spurs near the main track, and SMSC owned the remainder. A switch on each spur track divided it into four tracks which, together with additional spurs in the yard, led to various loading and unloading locations within the factory.
 
 
 6
 SMSC owned a single locomotive that it operated solely on its tracks to move incoming materials and outgoing products around its facility. Soo Line delivered inbound railcars to the first switch on the spur. SMSC railroad employees switched the cars and placed them in position for unloading at various loading docks in the factory. Outbound shipping arrangements were coordinated by marketing cooperatives[4], with which SMSC contracted to handle the marketing and sales of outgoing products for several beet sugar processors. At the direction of the marketing cooperatives, rail cars were loaded and moved to the first switch by SMSC employees for pickup by Soo Line. SMSC did not allow Soo Line locomotives to pass beyond the first switch on the spur track, apparently because the heavier Soo Line locomotives could damages the switches on SMSC's tracks.[5] SMSC had agreed not to allow its locomotive to enter Soo Line's tracks, and lock-out switches prevented it from doing so.
 
 
 7
 The connecting tracks were constructed and maintained according to a written agreement entered into in 1973 between SMSC and the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, which owned the right of way for the main tracks prior to Soo Line. Paragraph sixteen of this sidetrack agreement provided:
 
 
 8
 The Railroad Company hereby grants unto the Industry the right, license, and permission to move its own cars with its own means and forces over portions of the tracks [owned by SMSC].
 
 
 9
 It is understood and agreed that the Industry shall keep such movements under control at all times and will stop said cars before they reach the points designated by the letters A and B to keep them from going out on the property of the Railroad Company.
 
 
 10
 It is specifically understood and agreed that the Industry shall release, defend, indemnify and save harmless the Railroad Company from any claim, liability, loss, cost or expense resulting from loss of or damages to property ... and injury to or death of any person ... caused by or is [sic] any way connected with the handling of cars by the Industry's own means and forces whether such loss, damage, injury or death be caused in whole or in part by the negligence of the Railroad Company or otherwise.
 
 
 11
 This agreement continued in effect between Soo Line and SMSC after Soo Line acquired the right of way for the main tracks serving SMSC.
 
 
 12
 On January 20, 1991 Iverson lost his legs and an arm as the result of a rail car accident. At the time of the accident, Iverson was switching incoming rail cars filled with coal and coke, which Soo Line had delivered to SMSC's tracks. Iverson sought workers' compensation and brought this action for damages against SMSC alleging liability under FELA. The district court granted SMSC's motion for summary judgment, holding that Iverson had not stated a valid FELA claim because SMSC is not a common carrier, as required by the statute.
 
 II.
 
 13
 On appeal, Iverson argues that the SMSC railroad should be considered a common carrier because SMSC had contracted, in its agreement with Soo Line, to perform railroad functions that were a necessary part of Soo Line's interstate transportation, namely, the movement of incoming and outgoing railroad cars on the SMSC tracks between the first switch on the spur and the factory loading docks. Alternatively, he argues that SMSC, by virtue of the same agreement, is an agent of Soo Line and that FELA should be extended to impose liability on the agents of common carriers. SMSC responds that it is not liable under FELA because it is not a common carrier, and liability can only be imposed under the act against a common carrier.
 
 
 14
 Summary judgment is appropriate if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). All evidence and inferences must be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). We review a grant of summary judgment de novo.
 
 
 15
 The term "common carrier by railroad" has been defined to mean "one who operates a railroad as a means of carrying for the public,--that is to say, a railroad company acting as a common carrier." Edwards v. Pacific Fruit Express Co., 390 U.S. 538, 540, 88 S.Ct. 1239, 1240, 20 L.Ed.2d 112 (1968). Lone Star Steel Company v. McGee identified several factors that are relevant to determining whether a railroad is a common carrier:
 
 
 16
 First--actual performance of rail service, second--the service being performed is part of the total rail service contracted for by a member of the public, third--the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad and hence such entity is deemed to be holding itself out to the public, and fourth--remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.
 
 
 17
 380 F.2d 640, 647 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); see also Aho v. Erie Mining Company, 466 F.2d 539, 541 (8th Cir.1972). Industries operating in-plant rail facilities for their own benefit and not offering transportation to the public for a fee are not considered common carriers. See Kieronski v. Wyandotte Terminal R. Co., 806 F.2d 107, 109 (6th Cir.1986); Aho, 466 F.2d at 541.
 
 
 18
 Iverson argues that SMSC's railroad actually functions as a common carrier like the plant railroad in Lone Star. SMSC does perform rail service so the first factor in the Lone Star test is satisfied. It is more difficult to find that it meets the remaining three factors, however, and Iverson attempts to bring it within the ambit of Lone Star by focusing on the sidetrack agreement, by which he claims SMSC contractually assumed part of the Soo Line's delivery obligations. Iverson argues that when Soo Line held out to the public that interstate transportation by rail was available to move products to and from SMSC's factory, it necessarily held out the services that SMSC was permitted to perform under the agreement. This transfer to and from the loading docks was part of Soo Line's interstate delivery obligation, he says, and by contracting about the use of its tracks, SMSC assumed the duties of a common carrier.
 
 
 19
 This argument stretches the terms of the sidetrack agreement by reading it to impose an obligation on SMSC to complete the interstate delivery by moving rail cars placed on its track to the proper dock. The relevant language in paragraph sixteen grants SMSC the right to move cars on its own track, but does not create an obligation to do so. Nothing in the record supports the existence of such a duty. Although Soo Line's locomotive was, in practice, kept off of SMSC's tracks, the record indicates that this was related to its weight, rather than an agreement by SMSC to assume a duty to perform all railroading on its own tracks.
 
 
 20
 Iverson's argument also assumes that in the absence of the sidetrack agreement Soo Line would have had a duty to deliver directly to or from SMSC's loading dock over SMSC's tracks. A line hauler is only obligated, however, to make such delivery as is customary and reasonable. New York Cent. & H.R.R. Co. v. General Electric, 219 N.Y. 227, 114 N.E. 115 (1916), cert. denied, 243 U.S. 636, 37 S.Ct. 400, 61 L.Ed. 941 (1917). This does not necessarily require delivery to or from a loading dock. See Lone Star, 380 F.2d at 642-43 (line haulers are "obligated to deliver rail cars to the consignee's siding or industry track and to pick up outbound shipments at the consignor's siding"); General Electric, 219 N.Y. at 238, 114 N.E. 115 (delivery to industry's storage tracks completed carrier's obligation; carrier not obligated to distribute freight within plant).[6] Iverson has not produced any evidence to show that Soo Line's delivery to or from the entrance of the plant rail yard at the first switch on the spur was not customary or reasonable. The undisputed facts in the record indicate that such delivery was reasonable.
 
 
 21
 The Soo Line deliveries were made to and from tracks owned by SMSC, and its negotiated rate for factory deliveries did not include transport to or from the loading docks. The record shows that SMSC would have had to pay a fee for the Soo Line to provide that service. SMSC's movement of railcars on its own tracks between the loading docks and the first switch on the spur was not part of interstate transportation, but rather was in-plant transportation that occurred prior to or after interstate delivery. Because Soo Line's obligations as a carrier did not require it to deliver cars to or from SMSC's loading docks, it did not hold out that service, whether performed by itself or by SMSC under contract, to its customers when it offered interstate transportation.
 
 
 22
 Iverson also argues that SMSC held itself out as a common carrier to buyers of its outgoing products. He asserts that title to the shipped products passed to the buyers at the time they were loaded into railcars, and that the movement of the railcars between the loading dock and the first switch was thus part of the interstate transportation arranged for by the marketing cooperative. Iverson does not point to any evidence in the record to support this claim, however.
 
 
 23
 The plant railroad in Lone Star regularly transported for other companies located on its property. Its rail service was included in the line haul freight rate charged by the common carrier whose tracks were connected to the plant rail yard. The Fifth Circuit concluded that the defendant railroad had undertaken services that were a necessary part of the common carrier's total rail operation. It thus held itself out to the public to perform those services. 380 F.2d at 646. In contrast, SMSC did not perform part of the delivery service undertaken by another railroad, did not make deliveries for other companies, and did not hold itself out to the public to perform such services.
 
 
 24
 Moreover, whether a railroad holds itself out to the public is not the end of the Lone Star inquiry. The final factor in the Lone Star test is whether the railroad received a fee for the services performed. In Lone Star, the defendant railroad received a fee, albeit indirectly, for the delivery services it performed. In contrast, SMSC did not receive any sort of payment for the movement of cars on its own tracks, and, in fact, would have been required to pay the Soo Line for the service if it had not performed it.
 
 
 25
 The situation here is similar to that in Aho v. Erie Mining Company, 466 F.2d 539 (1972), which held that a railroad that transported taconite pellets from a company plant to the company dock and shipping facilities was not a common carrier. Id. at 541. Like that railroad, SMSC carried only its own freight and did not perform direct services for other industries or carriers. Its tracks carried only incoming raw materials for the factory and outgoing beet products it produced. Neither SMSC nor the Aho railroad held itself out to the public as willing to act as a common carrier, and neither made charges or posted tariffs for its operations or use of its equipment. Neither was regulated by the Interstate Commerce Commission or licensed by any agency to act as a common carrier. In both cases, the plant railroad operation did not function as a common carrier.
 
 
 26
 Iverson also argues that if SMSC is not itself a common carrier, it should be liable under FELA as the agent of a common carrier. He asserts that SMSC operated as an agent of Soo Line under the sidetrack agreement, but that agreement says nothing about any agency. Moreover, even if SMSC were an agent of Soo Line it would not be liable under the express terms of the statute, which does not impose liability on agents because they are not common carriers. 45 U.S.C. Sec. 51.[7] SMSC's agreement to indemnify Soo Line for damages connected with the operation of its own tracks does not mean that SMSC accepted liability under FELA for suits brought against it directly. Whether the statute's coverage should be extended is a question more appropriate for Congress, which has specifically limited FELA's coverage to employees of common carriers.[8] See Aho, 466 F.2d at 541.
 
 III.
 
 27
 SMSC argues on cross appeal that the district court abused its discretion when it denied SMSC's motion for sanctions under Fed.R.Civ.P. 11. Iverson's claims were not frivolous and the district court did not abuse its discretion in denying SMSC's motion.
 
 IV.
 
 28
 After studying the record we conclude that the district court did not err in granting summary judgment in favor of appellee or in denying its motion for sanctions. The judgment and the denial of sanctions are therefore affirmed.
 
 
 
 [1]
 The Honorable David S. Doty, United States District Judge for the District of Minnesota
 
 
 [2]
 SMSC has also filed a motion for sanctions under Federal Rule of Appellate Procedure 38. We conclude that this appeal is not frivolous and deny the motion
 
 
 [3]
 In July 1991 the Soo Line tracks were purchased by the Twin Cities & Western Railroad, which now provides SMSC's interstate transportation
 
 
 [4]
 North Central Sugar Marketing Cooperative marketed sugar products and Midwest Agri-Commodities marketed sugar by-products. The marketing cooperatives, which were owned by SMSC and other sugar cooperatives in the region, acted as SMSC's sole sales agents
 
 
 [5]
 This was not required by any written agreement, but the record indicates this was the practice
 
 
 [6]
 In General Electric, the court indicated that a carrier may have a duty to deliver to a loading platform in certain cases where private sidings are short and "the carrier's burden remains substantially the same whether the cars are left upon the siding close to the main tracks or hauled along the siding until they reach the plant." 219 N.Y. at 236, 114 N.E. 115. It distinguished such cases from those involving more complicated plant facilities, at which the delivery to a storage track at the plant would be a complete delivery. Id. at 238, 114 N.E. 115
 
 
 [7]
 45 U.S.C. Sec. 57 describes who is included in the term "common carrier":
 The term "common carrier" as used in this act shall include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier.
 
 
 [8]
 Iverson's reliance on Sinkler v. Missouri Pac. R.R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958), is misplaced. In Sinkler the Court did not extend FELA coverage to injuries caused by agents of railroads, rather it applied the statute's explicit terms to hold a common carrier liable for acts of its agent