CALCIUM CARBONATE COMPANY, a corporation, and Calcium Products Company, a corporation, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 3732.

United States District Court
S. D. Illinois, S. D.

July 6, 1966.

Carl G. Schmiedeskamp, Schmiedeskamp, Jenkins, Robertson & House, Quincy, Ill., Belnap, Spencer, Hardy & Freeman, Chicago, Ill., Daniel J. Sweeney, Chicago, Ill., for plaintiffs.

Richard E. Eagleton, U. S. Atty., Springfield, Ill., Walker & Williams, East St. Louis, Ill., Ralph Walker, East St. Louis, Ill., Robert S. Burk, Atty., Interstate Commerce Commission, Washington, D. C., R. H. Stahlheber, St. Louis, Mo., Robert S. Davis and C. W. Chapman, St. Louis, Mo., on brief, for defendants.

Before MAJOR, Senior Circuit Judge, and JUERGENS and POOS, Chief District Judges.

MAJOR, Senior Circuit Judge.

This action was brought under Sections 1336, 1398, 2284 and 2321–2325 of Title 28 U.S.C.A., to enjoin, set aside, annul and suspend a report and orders of the Interstate Commerce Commission entered January 11, 1965 and April 29, 1965, in the Commission's Docket No. 34274, Calcium Carbonate Company v. Missouri Pacific Railroad Co. et al., reported at 323 I.C.C. 688.

Plaintiffs are and have been for many years engaged, inter alia, in the business of selling ground limestone and shipping it from Carthage and Joplin, Missouri, to destinations throughout the southwest. For many years they have been

shipping this commodity under a scale of rates published in Section 4 of Southwestern Freight Bureau Tariff No. 162 Series (sometimes referred to as the "Section 4 rates"). This controversy arose out of an attempt by the railroads to collect retroactively a higher scale of rates than those provided by Section 4.

The shipments here involved moved from Carthage and Joplin, Missouri, to various destinations in that state as well as in the states of Arkansas, Kansas, Louisiana, Oklahoma and Texas, during the period 1960 to early 1963. Throughout that time the railroads had rendered freight bills for such shipments at the Section 4 rates which had been duly published and filed with the Commission, pursuant to the provisions of Section 6(7) of the Interstate Commerce Act (49 U.S.C.A. § 6(7)), which plaintiffs had paid. In early 1963, the railroads submitted revised freight bills to plaintiffs, based on the contention that Section 4 rates previously charged and collected throughout the preceding three years on shipments of ground limestone to feed mills were inapplicable and that the higher scale of rates contained in Section 3 of the same tariff was controlling.

Plaintiffs refused to pay the higher rates demanded by the railroads in 1963, retroactively for the shipments made during the preceding three-year period, whereupon the railroads initiated civil actions to collect the difference in charges. The Missouri Pacific Railroad Company and the St. Louis-San Francisco Railway Company filed suits against Calcium Carbonate, the former in the United States District Court for the Western District of Missouri, and the latter in the Southern District of Illinois, seeking to collect the difference in such charges. The same two railroads also filed suits against Calcium Products Company in the United States District Court for the Western District of Missouri, also seeking to collect the alleged undercharges on the shipments of ground limestone.

Plaintiffs as defendants duly filed appropriate answers in the suits commenced by the railroads. During the pendency of such suits, Calcium Carbonate filed complaint with the Commission, alleging that the Section 4 ground limestone rates it had been paying were applicable and, in the alternative, if inapplicable, the higher rates of Section 3, if imposed, would be unjust and unreasonable. The railroads claiming the higher rates on the shipments were named as the defendants before the Commission. A similar complaint was filed with the Commission by Calcium Products, which presented the same issues as those raised by Calcium Carbonate.[1]

A hearing was held before a Commission Examiner, at which evidence was adduced by Calcium Carbonate and by the railroads. The Examiner issued a recommended report and order dated May 1, 1964, sustaining the contention urged by Calcium Carbonate that the Section 4 rates which had been collected were and are the legally applicable rates. Upon appeal by the railroads from this report, Division 2 of the Commission issued its report on January 11, 1965, reversing the Examiner and holding that the Section 4 rates were inapplicable and that the higher Section 3 rates sought by the railroads were and are the applicable rates on plaintiffs' shipments. It further held that the higher Section 3 rates were not shown to have been unjust and unreasonable or otherwise unlawful.

On July 12, 1965, Calcium Carbonate and Calcium Products (which had agreed to be bound by the disposition of the Calcium Carbonate complaint) filed a joint complaint in this Court for a judicial review of the Commission's decision. Answers were filed by the respective par-

---

1. It was stipulated by Calcium Products Company and the involved railroads that they would abide by the final result reached in the case commenced by Calcium Carbonate Company. The railroads also agreed to hold in abeyance any further proceedings in the District Courts pending such decision.

ties, including the railroads as intervening defendants.

■ On plaintiffs' request and pursuant to statute, a special Court of three Judges, including a Circuit Judge, was constituted to hear and decide the case. No question is raised as to the propriety of this procedure.

Plaintiffs raise two questions: (1) Did the Commission err as a matter of law in concluding that Calcium Carbonate's ground limestone does not fall within the tariff commodity description in Section 4 of the tariff? and (2) Is there a rational basis for the Commission's conclusion that the Section 3 rates are not shown to be unjust or unreasonable?

The Examiner in his recommended report decided the first issue in favor of plaintiffs and, therefore, had no occasion to consider the second issue. The Commission decided the first issue against plaintiffs, thereby disagreeing with the Examiner's report. It then proceeded to a consideration of the second issue, which it also decided adversely to plaintiffs.

Section 4 rates were established in 1940, and from that time until this controversy arose plaintiffs shipped their limestone under the rates therein provided. The limestone description governing the application of the section was twice amended prior to December 1, 1959, when, as proposed by the railroads and at their insistence, it was amended to describe the commodity as follows: "Limestone, having value *only* [2] for building, paving, road-making or roofing purposes (and so certified by shipper on Bill of Lading), broken, crushed, ground or pulverized, in bulk or in paper bags, in straight CL or in mixed CL with common shells having value only for building, paving, road-making, or roofing purposes."

The commodity description in Section 3 reads, "limestone, ground or pulverized," without qualification.

While the sections evidently provide different rates for the same commodity, "the tariff specifically provides that, wherever the lower section 4 rates apply on a commodity for which rates are also provided in section 3, the section 4 rates take precedence and are the applicable rates." Thus, for the present we need only be concerned with whether the limestone involved falls within the Section 4 description.

Plaintiffs from December 1, 1959, when Section 4 was modified, until early 1963 (about the time the instant controversy arose), marked all of their bills of lading (called the shipper's certification) in the following manner, regardless of the type of business engaged in by the consignee, "The limestone herein has value for building, paving, road-making and roofing purposes," and continued shipping under the Section 4 rates.

Plaintiffs contend that the wording of Section 4 is ambiguous and that it should be construed as applying only to limestone having value, etc., rather than limestone having value only, etc. On the other hand, defendants contend that the language is plain and not susceptible of interpretation or construction. The Commission in its report (page 692) stated, "It is not contended nor does the record indicate that the tariff is ambiguous in this regard. On the contrary, the specific provision in the tariff requiring such certification as a condition precedent to the application of such rates is so clear as not to require further comment. The complainant's failure to comply with that requirement is fatal to its position that the section 4 rates are applicable on the shipments in question."

A literal reading of the provision appears to support this reasoning, but the question is whether it should be so read in view of the circumstances of the case, and particularly the incongruous result produced thereby.

The Commission in its report, referring to the Examiner's recommendation,

---

2. We emphasize the word "only" for the reason that it furnishes the sole basis for the controversy relative to the applicability of Section 4.

stated, "In the examiner's opinion, the instant situation comes within the principle set forth in Brown and Brown v. Boston & M. R., 266 I.C.C. 310, and Coastal Bag & Bagging Corp. v. Texas & N. O. R. Co., 277 I.C.C. 789. There it was held that the restrictive phrase, having value only for, should not be construed literally because a product having value for one purpose ordinarily has some other value, and a rate applicable on the commodity only for the purpose stated applies, regardless of the use of the commodity for some other purpose."

Plaintiffs cite other cases in support of their contention that the words "having value only for" have not been given a literal interpretation. Sonken-Galamba Corp. v. Union Pacific R. Co., 10 Cir., 145 F.2d 808, 812, and Hyman-Michaels Co. v. Chicago, R. I. and P. R. Co., 308 I.C.C. 339, 341.

It is well to keep in mind the precise description of the commodity involved, its characteristics and the purposes for which it may be used. In an appendix to the Commission report it is stated, "The commodity involved here is ground limestone. * * * The complainant sells only ground limestone. * * * The complainant's price for each grade is standard for all users. Only the volume connected with a sale and the effort required in the sale determines the price variations to different users of the same grade. * * * Ground limestone has many uses. It can be used in feed manufacturing, rice milling, coal mine dusting, roofing, roadmaking, paving, and building construction. But during the period involved in this proceeding, the complainant has shipped only C–4 for roofing, roadmaking, paving, and building uses. This grade has also been sold to feed manufacturers, rice millers, refineries, and others outside the construction industry."

The Commission in its report, concerning the commodity in issue, states, "Its transportation characteristics, including value, are similar regardless of its use." Defendants on brief apparently attempt to leave the inference, contrary to the record, that there is a difference in the commodity shipped for one of the uses designated in Section 4 and that shipped for the use of feed mills. Time and again on brief they refer to "feed-grade limestone." On this record there is no such commodity description.

The decision that Section 4 is inapplicable produces an absurd result and strips the section of all meaning. As the Examiner stated in his order, "There is no limestone which can be used solely for certain specific purposes and nothing else. For example, as mentioned above, this same limestone moves in large percentages to feed manufacturers as well as to those consignees engaged in construction. Section 4 uses the word only as follows: 'having value *only* for building, paving, road-making or roofing purposes' (emphasis supplied). Since there is no limestone useable for the named purposes to the exclusion of all others, section 4 rates cannot be applied exclusively to construction purposes except by the end-use test, which has been above discredited."

The Commission in its decision does not take issue with this reasoning; in fact, referring to Section 4 it states (page 694): "And as found by the examiner, for all that appears, no other limestone may fall within the restriction." Thus, neither plaintiffs nor any other shipper of ground limestone could in fact comply with the literal language of Section 4. A certification that ground limestone has value "only for building, paving, road-making or roofing purposes" would be false. This would be so whether the limestone has value for one or all of the purposes designated in Section 4 and is shipped to be used by a consignee for such purpose or for some other purpose.

■ It must be remembered that the railroads are the drafters of the tariffs which, the same as any other written instruments, should be construed strictly against them and in favor of the shipping public. Atlantic Coast Line R. Co. et al. v. Atlantic Bridge Co., Inc., 57

F.2d 654, 655; Union Wire Rope Corp. v. Atchison, T. & S. F. Ry. Co., 8 Cir., 66 F.2d 965, 966; United States v. Missouri Pacific Railroad Co., 5 Cir., 250 F.2d 805, 808.

In A. E. West Petroleum Co. v. Atchison, T. & S. F. Ry. Co. et al., 212 F.2d 812, the Court stated (page 816):

> "Therefore, a tariff is to be construed as having the meaning which it would reasonably have to such shippers. Where words in a contract, if construed literally, would produce an unfair, unusual or improbable result, such construction is to be avoided if possible."

The Court further stated (page 821):

> " * * * no unreasonable or unjust meaning will be accepted—particularly where such produces absurd and obviously unintended or non-understood results. A tariff is no different from any other contract, in that its true application must sometimes be determined by the factual situation upon which it is sought to be impressed."

■ We think it highly significant that the intervening railroads for a period of more than three years accepted without question the certification made by plaintiffs and other shippers of ground limestone as being in substantial compliance with Section 4. During that period they accepted from plaintiffs more than 1,400 cars of ground limestone, some consigned for the purposes enumerated in Section 4, some for other purposes. As the railroads were the progenitors of the tariff and acquiesced in plaintiffs' interpretation for such a long period, we think the inference inescapable that they interpreted it in the same manner. To think otherwise would necessarily attribute to the carriers a degree of indifference, negligence or plain stupidity, for which the record furnishes no justification.

Defendants' sole response to this reasoning is that the doctrine of waiver or estoppel cannot be invoked. No doubt such is the case, but the response misses the point. That the railroads now seek to recover increased rates, perhaps under legal compulsion, does not detract from the fact that for more than three years they gave recognition to plaintiffs' right to the benefit of the Section 4 rates.

■ Mindful of our limited scope of review of the Commission's order, it is our conclusion that the Commission's decision that Section 4 rates are inapplicable cannot stand. Such being the situation, we, like the Examiner, find no occasion to consider the controversy as it relates to Section 3 rates imposed by the Commission. Even so, the fallacy of the Commission's decision as it relates to Section 4 is emphasized by its application of the Section 3 rates. Plaintiffs contend that even though the Section 4 rates be held inapplicable, they furnish a yardstick to determine the reasonableness of rates to be charged. The Commission rejects this contention on the premise that Section 4 provides for depressed rates established in order to enable the railroads to meet truck competition. The Commission concludes, therefore, that the Section 4 rates do not constitute a basis for a determination as to the reasonable rates to be charged.

This reasoning is advanced in spite of the uncontroverted fact that under the Commission's interpretation of Section 4, no shipper of ground limestone can obtain the advantage of the lower rates provided by that section. It seems apparent, therefore, that the Section 4 rates can be of no aid to the railroads in meeting truck competition when the shippers, under the Commission's decision, are not permitted to take advantage of the reduced rates provided thereby. Thus, the purpose for the promulgation of Section 4 with its reduced rates is thwarted; in effect, the section is nullified.

The Commission's report is set aside and annulled, and the matter remanded to the Commission for further proceedings in conformity with this opinion.