ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

TABOR GRAIN COMPANY, Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

COOK INDUSTRIES, INC., Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

ILLINOIS GRAIN CORPORATION,
Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

PILLSBURY GRAIN COMPANY,
Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

GARNAC GRAIN COMPANY,
Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

BUNGE CORPORATION, Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

CARGILL, INC., Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

LOUIS DREYFUS GRAIN COMPANY,
Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

CONTINENTAL GRAIN COMPANY,
Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

FARMERS CO-OP GRAIN
COMPANY, Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

FISHER FARMERS GRAIN AND COAL
COMPANY, Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

DELAND FARMERS CO-OP GRAIN
COMPANY, Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

ASHKUM GRAIN COMPANY,
Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

CISCO CO-OP GRAIN COMPANY,
Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

WELDON GRAIN & CO-OP
COMPANY, Defendant.

ILLINOIS CENTRAL GULF RAILROAD
COMPANY, Plaintiff,

v.

ANCHOR GRAIN COMPANY,
Defendant.

79 C 0011 to 79 C 0013, 79 C 1412 to 79 C
1415, 79 C 1703, 79 C 1896, 79 C 2991 to
79 C 2995, 79 C 3723 and 79 C 4216.

United States District Court,
N. D. Illinois, E. D.

Feb. 4, 1980.

On Motion To Amend or For New
Trial March 31, 1980.

Raymond E. Belstner, Chicago, Ill., Joseph W. Phebus, Phillips, Phebus, Tummelson & Bryan, Urbana, Ill., for plaintiff.

Stephen C. Neal, Robert J. Bates, Jr., Kirkland & Ellis, Chicago, Ill., John H. Caldwell, Thompson, Hine, Caldwell & Greene, Washington, D. C., Richard P. Reising, Decatur, Ill., for defendant Tabor Grain Co.

Stephen C. Neal, Robert J. Bates, Jr., Kirkland & Ellis, Chicago, Ill., for Bunge Corp. and Garnac Grain Co.

Stephen C. Neal, Robert J. Bates, Jr., Kirkland & Ellis, Chicago, Ill., John H. Caldwell, Thompson, Hine, Caldwell & Greene, Washington, D. C., James L. Anderson, Bloomington, Ill., for Illinois Grain Corp.

Harold E. Spencer, Stephen Herman, Belnap, McCarthy, Spencer, Sweeney & Harkaway, Chicago, Ill., for Cargill, Inc. and Pillsbury Grain Co.

Walton N. Smith, Patricia F. Cross, Lord, Bissell & Brook, Chicago, Ill., for Cook Industries, Inc.

Michael W. Coffield, Charles W. Deuser, II, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for Anchor Grain Co., Ashkum Grain Co., Cisco Co-op Grain Co., Deland Farmers Grain and Coal Co., Farmers Co-op Grain Co., Fisher Farmers Grain and Coal Co., and Weldon Grain & Co-op Co.

Daniel R. Murray, Robert A. Wason, Jenner & Block, Chicago, Ill., Andrew P. Goldstein, Washington, D. C., for Continental Grain Co. and Louis Dreyfus Grain Co.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge.

In January, 1979, Illinois Central Gulf Railroad Company ("ICG") filed this action against Tabor Grain Company to collect outstanding tariff charges accrued against grain shipments which were made under the terms of ICG Tariff 604–A, ICG 92. ("Tariff 604").[1] ICG has brought fifteen similar suits, seven transferred from the Central District of Illinois, alleging that other grain companies failed to pay appropriate freight charges pursuant to Tariff 604.[2] There are no factual disputes and the parties have stipulated to the pertinent issues. The defendants in these consolidated cases have moved for summary judgment under Rule 56, Fed.R.Civ.P.

From 1972 to 1978, ICG maintained multiple-car export grain tariffs. One of these, Tariff 604, provided for high-volume shipping at a reduced rate for 100-car unit train shipments of grain for export. To be eligible for these lower rates, a grain shipment was required to weigh a minimum of 9,800 tons and to be shipped in no more than 100 covered hopper cars. In addition, a minimum of ten such train shipments was required during a 12-month period. This requirement could be met by two sets of five consecutive train trips.[3] The key provision of Tariff 604 for the purpose of this litigation is Item 25(c). In short, Item 25(c) states that the lower rates will not apply whenever the ICG is required to switch more than four cuts of empty cars to, or more than four cuts of loaded cars from, the shipper's facility.[4] If any of the above conditions are not met, the higher export rates for four-car shipments required by a different tariff would apply.

Most of the defendants are in the business of buying grain for export resale.[5] In order to transport the grain to seaports for export, these defendant-shippers have arranged with the ICG to operate unit grain

---

1. Tariff 604–A, ICG 92, which became effective on October 9, 1978, succeeded ICG Tariff 19611–B, ICG 11, which was in effect until April 17, 1977, and ICG Tariff 604, ICG 69, which was effective from April 17, 1977, until October 9, 1978. Since the language of the two relevant but superceded tariffs is identical, all three will be referred jointly to as the "Tariff 604."

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1337, providing for jurisdiction arising under any Act of Congress regulating commerce.

3. A consecutive train trip is one in which a loaded train is moved from a Tariff 604 elevator for delivery to a Gulf port and returned to its next origin for reloading.

4. A 'cut' of railroad cars is a "quantity (one or more) of cars delivered to or removed from the track or tracks of the consignor or consignee at origin and/or destination at one location at one time. Such cars may be spotted on, or pulled from, more than a single track." *Norfolk and Western Railway Co. v. B. I. Holsen & Company*, 466 F.Supp. 885 at 890 (W.D.Ind.1979), *appeal pending*, No. 79–1418 (7th Cir.).

5. At least nine of the defendants are in the export business: Bunge, Cargill, Continental, Cook, Louis Dreyfus, Garnac, Illinois Grain, Pillsbury, and Tabor. The documents before the Court appear to indicate that one other defendant—Anchor—is also included in this group.

trains under Tariff 604. The grain handled by the defendants has been shipped from their own and a number of other elevators located throughout Illinois and Indiana.[6] The defendants shippers have been loading grain into 100 car trains for a number of years and have received the lower rate under Tariff 604. Plaintiff, however, now alleges that the defendants failed to comply with the four-cut requirement in some or all shipments involving certain trains operating from the nine loading origins in Illinois from 1976 through 1978.[7]

**6.** Five of these defendants operate elevators and have been named as the sole defendants in five complaints: Ashkum, Cisco, Deland Farmers, Farmers Co-op, and Fisher Farmers. The remaining defendant, Weldon Grain, may also belong in this group.

**7.** The parties agree that all shipments originating from the other loading points mentioned in the complaints were in compliance with the four-cut requirements. Stipulation ' 5.

**8.** The plaintiff ICG has argued that to comply with Tariff 604, an elevator must have 1,650 or more feet of side track on each side of the elevator spout, the amount of space necessary to hold 25 hopper cars, or one of the four cuts mentioned in Tariff 604. Sidetrack is usually parallel trackage connected to the main line by switch connections. This allows cars to be shifted from the main line to a secondary track for purposes of loading, unloading, or storage.

**9.** A brief sketch of the loading procedure and track layout of each elevator may be helpful to an understanding of the issues in this case.
(1) Ashkum
   The total length of sidetrack located at the Ashkum elevator is 7,900 feet. Both sides agree that the trackage to the north of the elevator spout is approximately 6,400 feet. The length of the trackage to the south of the elevator is approximately 1,500 feet, slightly less than the amount needed to hold a 25-car train. The loading procedure at Ashkum involved four cuts of 25 cars each. An ICG crew, using ICG equipment, conducted all the movements of the cars except for the actual positioning of each car under the loading spout. Any and all additional cuts performed by the ICG engine and crew were fully paid for on a rental basis, as evidenced by payment invoices.
(2) Cisco
   The sidetrack at Cisco is 1,020 feet, 480 feet on one side and 540 feet on the other. Two different procedures were utilized for loading and moving trains onto and off of this track. For two shipments, an ICG engine arrived at the elevator with all 100 cars. The engine then loaded the first cars onto the sidetrack and left. At this point, the movement of the cars to and

There is no dispute that at each of the nine loading origins more than four switches often were executed on the movement and loading of the 100 car trains. The dispute centers around whether these extra cuts were violative of the tariff and/or whether the layout of the elevators themselves rendered the 604 rates inapplicable.[8] Each of the sixteen complaints involve the loading of grain at one or more of the nine elevator origins located at Ashkum, Cisco, Cropsey, Dalton City, Deland, Dewey, Macon, Sullivan, and Weldon.[9]

from the loading spout was handled solely by Cisco tractors. After the loading was complete, the ICG engine returned and picked up the hopper cars. A slightly different procedure was used to load one train. In that instance, an ICG engine only brought 10 empty cars to the elevator. After the engine had left, these cars were moved and loaded in the same manner as described above. The ICG then returned, picked up the loaded cars, and left 80 empty cars. This procedure continued until all 100 cars had been serviced.
(3) Cropsey
   The total length of the sidetrack at Cropsey is 1,380 feet, 900 feet for empty cars and 480 for loaded cars. At this elevator origin, an ICG engine would bring 100 cars in one unit and back the rear cars onto the sidetrack. The ICG crew separated eight cars which were moved to the loading spout by Cropsey tractors. These cars then were loaded and rolled down a sloping grade onto the main line. After each set of cars was loaded, the ICG crew and engine bumped the next set of cars from the mainline onto the sidetrack and performed the necessary uncoupling. The Cropsey tractors did all of the movement of the cars to and from the loading spout. This procedure was followed until all the cars were loaded. At this point, the ICG joined all the cars together and left. Invoices indicate that the personnel and equipment used to move the cars had been rented from the ICG by Cropsey.
(4) Dalton City
   The sidetrack configuration at this elevator is considerably more complex than the others. North of the main line is a 1,150 foot sidetrack, south is a 1,600 foot sidetrack, and off the south sidetrack is a spur loading track approximately 750 feet in length. Although all 100 empty cars were brought to the elevator by the ICG, only the first 25 were moved onto the south sidetrack where they were uncoupled from the rest. The remaining 75 cars were then taken by the ICG to a different location for temporary storage. Eight cars at a time were then moved by Dalton City tractors for loading. After all 25 were loaded, the ICG engine removed these cars for temporary storage and returned with 25 more empties. The

Personnel of the ICG had attended and observed the loading procedures at these elevator origins as to the shipments in question, but never had expressed the view that the operations did not fall within the terms of Tariff 604. Moreover, the ICG never

same procedure was followed until all 100 were loaded. All the movements done by ICG equipment and crew were paid for on a rental basis.

(5) Deland

The elevator spout at Deland is exactly in the middle of the 1600 foot sidetrack. The process of moving the trains to this spout for loading would begin when the ICG brought 50 to 60 empty cars to Deland. The empty rear cars were pushed onto the sidetrack, separated, and moved to the loading spout by Deland tractors. The remaining empty cars were then pushed onto the sidetrack by the ICG engine. When each car was filled, Deland personnel rolled it downhill and onto the mainline. When all 50–60 cars were loaded, they were collected by the ICG engine and removed. The ICG engine later returned with the remaining empty cars and the same procedure was followed. Deland either rented from the ICG all the equipment and crew used in the movements of cars to and from the loading arm or used its own equipment and personnel.

(6) Dewey

The sidetrack at Dewey is only approximately 1100 feet in length, 480 feet on one side of the elevator spout and 620–650 feet on the other. The ICG engine, after bringing 100 empty cars to the elevator, pushed 10 cars onto this sidetrack and to the loading spout. A tractor provided by Dewey then pulled the cars under the spout for loading. When 10 cars were loaded, the brakes were released and the cars were rolled downhill and onto the mainline. This procedure was repeated until all 100 were loaded, at which time the ICG collected the cars and left. During the loading procedure, the empty cars were pushed onto the sidetrack by an engine and crew rented from the ICG, by trackmobiles rented from third parties, or by tractors supplied by Dewey. When ICG equipment was involved, the services were paid for in full.

(7) Macon

The sidetrack at Macon is over a mile long, although the length on one side of the spouts is only 1,200 feet. Initially, 50–65 cars brought by the ICG crew were backed onto this sidetrack in such a way that the back two cars were centered under the loading spouts. Eighteen were uncoupled, with the remaining empty cars being pulled away by the ICG. The actual loading was done by trackmobiles owned by Tabor Grain. The ICG would return with 32–47 empty cars, drop them off, and pick up the loaded ones in one of two ways. Either the ICG left the empty cars in the mainline and collected the loaded cars, leaving it up to Macon personnel to move the empty cars to the sidetrack for loading, or the ICG moved the 32·47 empty cars to the loading spout and then retrieved the loaded ones, leaving only the actual car-by-car movement and loading to Macon personnel. The ICG engine returned with the remaining empty cars and the same procedures were followed. In either case, no ICG personnel were used on more than four cuts of cars to or from loading.

(8) Sullivan

The total length of the sidetrack at Sullivan is 1,780 feet, all of which is on one side of the loading spout. In order to load given this layout, the ICG brought 100 empty cars and delivered them in one cut by pulling the front ten empty cars onto the sidetrack with the remaining cars extending along the mainline. At this point, all movements over and above the four allowed cuts of cars before and after loading were performed by an ICG engine and crew that had been rented by Sullivan. Additional charges were paid for the extra services.

(9) Weldon

Weldon's layout is similar to Sullivan's in that 840 out of 1,020 feet of track are on one side of the spout. The procedure followed in loading the cars with grain, however, is somewhat different. Only 50 empty cars were brought to Weldon although the ICG pulled them to the loading spout. Six cars at a time were pushed under the spout by use of a four-wheel drive tractor and a rented front end loader. The six cars were loaded and then rolled down the hill to the mainline by rented trackmobiles. As the loaded cars entered the mainline, the ICG engine collected them until all 50 were ready to be taken. The ICG engine later returned with 50 more empty cars and the loading was repeated in the same manner. All the movements performed by the ICG involving more than four cuts were paid for on a rental basis by Weldon.

The facts forming the basis for the foregoing descriptions have been taken from uncontradicted affidavits (unless otherwise noted) submitted by individuals familiar with and responsible for the loading of the relevant shipments in issue here:

| ELEVATOR | AFFIANT | POSITION |
|---|---|---|
| Ashkum | John Rashinkas | General Manager, Ashkum Grain Co. |
| Cisco | William Sago | General Manager, Cisco Co-op Grain Co. |
| Cropsey | Leo Smith | Manager, Anchor Grain Co. |
| Dalton City | Paul Thomas | General Manager, Farmers Co-op |
| Deland | Dale Allen | Manager, Deland Farmers |
| Dewey | John Cummings | Manager, Fisher Farmers |
| Macon | Bruce Mallan | Manager, Macon Grain |
| Sullivan | John Christ | Manager, Sullivan Grain |
| Weldon | Curt Miller | Manager, Weldon Co-op |

advised the shippers that rental of ICG equipment for additional movements of cars was to be counted toward the four cuts permitted by 604 or that 100 car trains would be disqualified by such movements. In fact, a number of the affiants on several occasions have submitted letters from the ICG indicating that the elevator layouts complied with 604 requirements and that shipment of grain from these locations would be eligible for the lower rates permitted under Tariff 604.[10]

The scope of the issues has been considerably narrowed. The parties have stipulated that if the shipments in question complied with all the terms and conditions of Tariff 604, only the rates in that tariff would be applicable. To the extent that these shipments allegedly did not comply with the requirements, the parties have agreed that noncompliance was due solely to failure to meet the terms and conditions of Item 25(c) of Tariff 604, the four-cut requirement.[11] Thus, there remain for resolution three legal issues presented by defendants' motion for summary judgment. First, there is the question of whether certain shipments of grains from the nine above-mentioned loading locations complied with the four-cut requirement of Tariff 604. Second, there is the issue of whether cuts made beyond the four-cut requirement by use of rented ICG equipment and crews constitute a violation of Tariff 604's four-cut rule. Defendants argue that the historical application of Tariff 804 permits such rentals. Plaintiff, on the other hand, stresses that the language of Tariff 804 permits no such rentals. Moreover, plaintiff contends that even if

Tariff 804 could be so construed, it in no way modifies the 604 requirement of four or less cuts of cars. Finally, plaintiff argues that defendants are estopped from asserting that plaintiff has waived his right to collect legally owned freight charges.

## I. TARIFF 604—THE FOUR-CUT REQUIREMENT

Item 25(c) of Tariff 604, entitled "Terminal or Transit Privileges or Services," describes the four-cut requirement:

> Rates named herein will not apply when due to shipper's disability assembly of trains at origin requires Illinois Central Gulf Railroad to switch more than four cuts of empty cars to shipper's facility or more than four cuts of loaded cars from shipper's facility or when due to consignee's disability distribution of train at destination requires Illinois Central Gulf Railroad to switch more than four cuts of loaded cars to consignee's facility or more than four cuts of empty cars from consignee's facility.

Plaintiff argues that Tariff 604 provides that the tariff will not apply when the ICG is required to switch more than four empty cars to or more than four loaded cars from the shipper's facility.[12] In addition, plaintiff asserts that the four-cut language implicitly contains a trackage requirement; i. e., that an elevator can comply with the tariff only when there is sufficient sidetrack on either side of the elevator spout to hold 25 cars. In this way, only four cuts would be required to load and move a 100-car unit train.

10. These letters are attached to the affidavits submitted by Ashkum, Cisco, Dalton City, Macon, Sullivan, and Weldon.

11. The parties have agreed that if the four-cut requirement was met from all nine loading origins, then the consecutiveness requirement of Item 350(c) was met as well. As a result, the Court need not elaborate on the nature of this requirement.

12. The Court notes that plaintiff in this case concedes the meaning of the term "shipper's facility." In *Norfolk and Western Railway Co. v. B. I. Holsen & Company*, 466 F.Supp. 885 (N.D.Ind.1979), *appeal pending*, No. 79–1418 (7th Cir.), the plaintiff argued with respect to a

tariff nearly identical to 604 that the term "shipper's facility" as used in the switching restriction referred only to those tracks either owned or leased by the shipper, and not those owned by the railroad but used by the shipper. The trial court held in the case the "shippers facility" did involve that section of sidetrack set aside for and/or customarily used by local elevator. The tariff contained no language explicitly requiring the elevators to own or lease the track. The court concluded that if the railroad were allowed to impose a lease charge, then more money than is permissible would be collected under the tariff.

For the reasons that follow, the Court holds that the four-cut requirement refers to only those cuts performed by the ICG pursuant to the terms and conditions of the tariff, in no way restricting the number of additional cuts which may be performed by defendants or by others on a rental basis. In addition, the Court finds nothing in Tariff 604 which explicitly or implicitly requires an elevator to have a certain length of track available to it in order to qualify for the lower rates.

### A. Four-Cut Restriction

It is undisputed that more than four cuts were required and, indeed, were performed in loading the 100-car unit trains at the nine elevator origins. Whenever more than four cuts were made, however, the shippers carried them out in one of three ways: (1) by use of their own equipment;[13] (2) by use of equipment rented from third parties;[14] and/or (3) by use of equipment rented from ICG.[15] Defendants argue, and the Court agrees, that the four-cut requirement is for the convenience of the carrier. By limiting the number of cuts to be performed under the tariff to four, the ICG is ensuring that its engines and crew will not be delayed unnecessarily or undercompensated in loading a 100-car unit train. The central question is whether Tariff 604 requires that no more than four cuts can be performed for a 100-unit train, or simply means that the ICG will perform only four cuts "free of charge," with any additional cuts to be arranged by the shipper and grain elevator on a rental basis apart from the tariff.

The interpretation of an ambiguous tariff provision presents a question of law. *Penn Central Co. v. General Mills, Inc.*, 439 F.2d 1338, 1340 (8th Cir. 1971). In construing a tariff, "its terms must be taken in the sense in which they are generally used and accepted; and it must be construed in accordance with the meaning of the words used." *Id.* at 1340–1341; *Chicago, Burlington & Quincy Railroad Co. v.*

*United States,* 221 F.2d 811 (7th Cir. 1955). Strained constructions of the tariff are to be avoided, particularly when they would lead to impractical or unjust results. *National Van Lines, Inc. v. United States,* 355 F.2d 326, 332 (7th Cir. 1966). Rather, the courts have expressed a preference for tariff interpretations which "conforms to the intentions of the framers of the tariff, avoids possible violations of the law, and accords with the practical application given by shippers and carriers alike." *Penn Central, supra,* at 1341. In other words, the Court will consider the practical application given to the tariff by the parties themselves in determining the meaning of the tariff:

> We think it highly significant that the intervening railroads for a period of more than three years accepted without question the certification made by plaintiffs and other shippers of ground limestone as being in substantial compliance with Section 4. During that period they accepted from plaintiffs more than 1,400 cars of ground limestone, some consigned for the purposes enumerated in Section 4, some for other purposes. *As the railroads were the progenitors of the tariff and acquiesced in plaintiff's interpretation for such a long period, we think the inference inescapable that they interpreted it in the same manner.* To think otherwise would necessarily attribute to the carriers a degree of indifference, negligence or plain stupidity, for which the record furnishes no justification.

*Calcium Carbonate Company v. United States,* 256 F.Supp. 99, 103 (S.D.Ill.1966) (emphasis supplied). Finally, as suggested by *Calcium Carbonate,* ambiguities in the meaning of a tariff should be construed strictly against the carrier who drafted the tariff. *See also Penn Central, supra; Union Pacific Railroad Co. v. United States,* 434 F.2d 1341 (Ct.Cl.1970); *National Van Lines, Inc. v. United States,* 355 F.2d 326

---

13. The elevators at Cisco, Cropsey, Dalton City, Deland, and Dewey used this procedure.

14. Only the elevators at Dewey and Macon used this procedure.

15. The elevators at Ashkum, Cropsey, Dalton City, Deland, Dewey, Sullivan, and Weldon all rented ICG equipment to achieve the cuts on some shipments.

**118**

(7th Cir. 1966); *Kansas City Southern Railway Co. v. Kansas City Power & Light Co.*, 430 F.Supp. 722 (W.D.Mo.1976), *aff'd*, 551 F.2d 1134 (8th Cir. 1977).

■ Under these principles, the Court finds the defendants' interpretation of the four-cut requirement the more convincing one. Plaintiff has not shown that its restrictive definition of the four-cut requirement is the version generally used and accepted. Although the lower rate of Tariff 604 clearly does not apply in those situations where the ICG is required to switch more than four cuts of empty or loaded cars, nowhere does the tariff preclude the ICG from performing additional switches under separate arrangements. To the extent this creates an ambiguity, the principles of construction require that it be resolved against the plaintiff, who drafted the tariff.

Nor has the ICG shown that its interpretation is necessary to insure that the tariff serves the purpose for which it was intended. As indicated above, the purpose of the four-cut limit is primarily to protect the railroad. Additional car movements by the shippers or elevator operators on a rental basis do not frustrate the underlying purposes of the tariff. The plaintiff has failed to indicate why it needs the protection of Tariff 604's four-cut limit when other parties agree to perform the additional switching.

Moreover, as was the case in *Calcium Carbonate*, it is clear that plaintiff herein not only acquiesced in the applicability of the lower rate but in many cases actively encouraged the shippers to continue their unloading operations and procedures while at the same time charging the lower rate. During the period in question, 1976 through 1978, both plaintiff and defendants agreed as to the interpretation of four-cut requirement. Although plaintiff now seeks to advance a different interpretation of the four-

cut limit, the Court finds that the agreed meaning of Item 25(c) was that the ICG was obligated to make only four cuts of cars under the tariff, and that additional movements could be arranged by the shippers or elevators.

### B. Trackage Requirement

Plaintiff also seeks to read into Item 25(c) a trackage requirement. The argument is that since only four cuts could be performed by ICG engines under the tariff, this restriction implies a requirement that each elevator origin must have sufficient side-trackage to hold one-fourth of a 100-car train on both sides of the elevator spout, or 25 cars. Since each car is approximately 60 feet long, there must be at least 1,650 feet of track.[16] As the description of each elevator indicates, none of these origins have sufficient length to hold 25 cars on both sides.[17]

■ The Court finds no merit in this argument by plaintiff. There is nothing in the language of Item 25(c) as it stood from 1976 through 1978 to indicate that such a requirement was intended. "The construction placed on this language by the railroad is quite strained, particularly in light of the fact that this meaning could easily have been spelled out with particularity in the tariff itself." *Norfolk and Western Railway Co. v. B. I. Holsen & Company*, 466 F.Supp. 885 at 891 (W.D.Ind.1979), *appeal pending*, No. 79–1418 (7th Cir.).

In addition, the Court finds it significant that Tariff 604 was superceded on October 1, 1979, by Tariff 604–A. Item 25(c–2) of the new tariff explicitly provides for a trackage requirement:

> Rates named herein apply only from origin facilities with sufficient private track capacity (owned or leased) to accommodate loading of shipment with not to exceed four switches. . . .

---

**16.** This includes 1,500 feet for the 25 cars plus 150 feet from the switch to allow clearance from the mainline plus 12½ feet for slack action. Howard D. Koontz Affidavit ¶ 9.

**17.** It is unclear whether Ashkum had sufficient trackage under this theory. The outcome of the case as to the shipments at Ashkum, however, does not turn on the resolution of this issue.

The addition of this specific provision suggests that minimum trackage is a totally new requirement, one which was not within the contemplation of Tariff 604. It appears that the ICG by this amendment intended to eliminate what it deemed to be a weakness in its own tariff. In *Norfolk and Western, supra,* the railroad argued that under a tariff containing a one-cut limitation 10 cars could not be loaded without a second switching movement. The tariff in question in. *Norfolk* provided in relevant part:

> Rates will not apply when due to shipper's disability, assembly of shipment at origin requires originating line to switch more than one cut of empty cars to shipper's facility or more than one cut of loaded cars from shipper's facility or when due to consignee's disability, distribution of shipment at destination requires terminating line to switch more than one cut of loaded cars to consignee's facility or more than one cut of empty cars from consignee's facility.

The *Norfolk* court dismissed the railroad's contention, finding that in most instances the railroad delivered a switch consisting of less than 10 cars even though the shipper had ordered ten. Thus, the railroad of its own volition delivered the cars in more than one cut. On these facts, the court concluded that when the railroad, for its own convenience, furnishes fewer cars than are ordered, it cannot complain that the additional cut or cuts violate the tariff. *Norfolk,* at 891.

The same principle applies in this case as well. Although the shippers ordered 100-car units, the ICG on several occasions delivered a train with fewer than 100 units.[18] Moreover, the ICG at the time also indicated to the shippers that this procedure still conformed to the lower-rate tariff. In so doing, the ICG was indicating that four

equal cuts of 25 cars each was not a requirement under Tariff 604. Thus, the Court is satisfied that the ICG during the period 1976 through 1978 agreed with the shippers that 604 did not require an amount of trackage sufficient to hold four equal cuts of 25 cars.

## II.  ADDITIONAL MOVEMENTS BY RENTED ICG EQUIPMENT AND CREWS

As previously stated, defendants have admitted that in those instances where more than four switches were necessary to load the train, those extra movements were performed in one of three ways: (1) by equipment owned by the shippers or elevators, (2) by equipment rented from third parties, or (3) by equipment rented from the ICG. The ICG has conceded that the first two methods would violate the tariff only if its interpretations of the four-cut and trackage requirements are upheld.[19] Since this argument has been rejected, plaintiff is left with the argument that even if the four-cut requirement does not limit the actual number of total switches that can be made, any additional switches by rented ICG personnel and equipment nevertheless violate the terms and conditions of 604.

The tariff under which charges for rented ICG equipment was made is 804. The relevant portion of Item 200, Rule 3 entitled "Application of Rules Governing Receipt and Delivery of Cars of Freight," provides that

> [W]hen receipt or delivery of a car or cars as provided in Rules 1 and 2 cannot be accomplished in continuous movement at the carrier's ordinary operating convenience because of interruption, interference or any other condition caused by the shipper or consignee, the carrier will arrange for receipt or delivery under the

---

**18.** Some variant of the four-cut requirement was performed at the following elevators: Deland, Dewey, Macon, and Weldon.

**19.** On page 8 of the Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment, plaintiff argues that movements of the cars by defendants themselves did not

change the fact that the elevators had insufficient track to hold 25 cars. It is only with respect to movements by rented ICG equipment that plaintiff claims Tariff 804 does not modify Tariff 604. *See* discussion in Part III of the Court's opinion.

following provisions (see Note 3 of Item 210);

A. If it appears that the delay will be of a temporary nature the locomotive will be held at the nearest available location and the service completed when conditions permit. For delay to the locomotive when so held, a charge of $3.29 for each five minutes or fraction thereof in excess of 30 minutes will be assessed, which charge will be in addition to the published rate or rates.

Charges will be assessed in accordance with the next preceding paragraph when delays encountered during a locomotive trick or shift aggregate more than 30 minutes.

Plaintiff argues that the meaning of Tariff 804 is unambiguous; it is directed towards "delay to the locomotive," not additional switches. Thus, plaintiff concludes Tariff 804 does not modify Tariff 604. The Court, however, disagrees. Tariff 804 deals with rules governing the receipt and delivery of freight cars. Rule 3 deals specifically with delays in these procedures and the charges which will be assessed for such delays. The language of the tariff does not indicate that 804 should not affect 604; nor is it clear what situations fall within the meaning of "delay to the locomotive."

While the language of 804 appears to be non-technical and fairly straightforward, the meaning now ascribed to the words has resulted in different interpretations. Applying the *Penn Central* rules of interpretation to the ambiguity in Tariff 804, the Court concludes that during the relevant period, both parties interpreted Tariff 804 to permit the use of rental agreements as a means of satisfying the requirements of 604. There is substantial uncontested evidence indicating that the ICG willingly rented its equipment to shippers or elevators to handle additional cuts while at the same time continuing to charge the lower freight rate available under Tariff 604. In many instances ICG personnel actively encouraged this type of arrangement in order to comply with the requirements of Tariff 604.

Moreover, there is strong evidence that the ICG considered that such rentals were permissible under Tariff 804. A number of invoices sent by the ICG to shippers or elevators list these rental services and indicate that the tariff referenced by the ICG for assessing these charges was "Tariff 804 Item 200 Rule 3 Plan A."[20] Not only did plaintiff acquiesce in defendants' interpretation of the scope of 804, plaintiff also interpreted the provision in the same way. In essence, all parties construed Tariff 804 to permit additional charges for the performance of additional car movements by the ICG as a means of insuring compliance with the four-cut requirement.[21]

Under plaintiff's interpretation of Item 200 of Tariff 804, a shipper who loaded a 100-unit train at an elevator using its own tractors for additional switches would be eligible for the lower rates of 604. However, the same shipper who rented ICG equipment for its car movements, would not be permitted to ship under the lower rates. Such discrimination based on who does the additional switches is neither justified nor intended by Tariff 804. Moreover, if plaintiff does not need Tariff 604's protection from additional switches performed by others, it is unclear why such protection becomes necessary when the ICG voluntarily enters into a separate agreement to perform the additional switches. From this evidence, the Court finds that 804 was in-

**20.** The relevant invoices are attached to the affidavits submitted by the defendants, *see* note 7, *supra*;

    (1) Smith Affidavit, Exhibits C, D, E, F
    (2) Thomas Affidavit, Exhibits B, E, F
    (3) Cummings Affidavit, Exhibits B, C, D, F, G, J, K
    (4) Christ Affidavit, Exhibits D, E, F, G, H, I, J, K

**21.** The ICG has admitted in letters that the procedures at the elevators were in compliance with Tariff 604, thus shippers were assured they would be able to obtain the lower rates at these locations. *See* exhibits to defendants' affidavits, note 7, *supra*.

terpreted by both parties to apply to 604, thus permitting rented ICG equipment to perform additional movements of cars while not violating the requirements of 604.

## III. ESTOPPEL OR WAIVER

Finally plaintiff argues that defendants are not really claiming that the tariffs are ambiguous. Rather, plaintiff asserts that defendants actually are alleging the ICG has misapplied the tariffs and thus should be estopped from collecting additional charges. Assuming that estoppel forms the basis of defendants' defense, plaintiff then submits that such an argument is untenable:

No contract of the carrier could reduce the amount legally payable; or release from liability a shipper who had assumed an obligation to pay the charges. Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount by a person liable therefor.

*Louisville & N. R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924).

■■■ The Court does not quarrel with this principle. However, plaintiff's argument in this context is misplaced. The issue in the case is not whether the carrier misapplied the tariffs; it is the meaning of the ambiguous language contained in the tariffs.[22] The Court recognizes that tariffs are designed to promote uniformity and avoid discrimination in rates. To permit the doctrine of estoppel to be invoked where an erroneous rate was charged would undermine this policy of uniformity. *Illinois Central Gulf Railroad Company v. Golden Triangle Wholesale Gas Company*, 586 F.2d 588, 592 (5th Cir. 1978). Uniform-

ity is ensured by the fact that tariffs have the force of law. An accidental or intentional misquotation or misstatement of the proper rate is no defense in a suit to recover the proper amount. Moreover, the law conclusively presumes the shipper's knowledge of the lawful rate. *Kansas City Southern Railway Co. v. Carl*, 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913). What this amounts to is that the rate filed with the Interstate Commerce Commission is the lawful rate; no deviation by any party is allowed.

■■■ The Court finds that defendants are not invoking—nor could they invoke—the doctrine of waiver or estoppel. The ICG now may believe that the tariff was misapplied from 1976 to 1978. However, the evidence clearly reveals that during that period both the shippers and the carrier interpreted the language in the same way; or at the very least that the carriers willingly acquiesced in, and in fact supported, the shipper's interpretation. Given these findings, plaintiff cannot successfully argue that the tariff was merely misapplied. The procedures followed and the rates applied were the result of a joint agreement by the shippers and the carriers regarding the proper application of Tariffs 604 and 804.

## ORDER

For the foregoing reasons, defendants' joint motion for summary judgment on all issues is granted. It is so ordered.

## MEMORANDUM OPINION AND ORDER

### On Motion To Amend or For New Trial

Plaintiff, Illinois Central Gulf Railroad Company ("ICG"), brought these actions alleging that defendants, who either

---

**22.** *Calcium Carbonate Company v. United States*, 256 F.Supp. 99 (S.D.Ill.1966), involved a similar dispute over the meaning of language in a tariff provision. The court noted the distinction between the questions of interpretation of ambiguous language and of misapplication:

Defendants' sole response to this reasoning is that the doctrine of waiver or estoppel cannot be invoked. No doubt such is the

case, but the response misses the point. That the railroads now seek to recover increased rates, perhaps under legal compulsion, does not detract from the fact that for more than three years they gave recognition to plaintiffs' right to the benefit of the Section 4 rates.

*Id.* at 103.

shipped and/or loaded unit trains of grain, failed to comply with the terms and conditions of ICG's Tariff 604. As a result of the alleged non-compliance, ICG claims that the freight rate charged for these trains was too low, and that defendants are liable for the additional fees due. Defendants filed a joint motion for summary judgment, which the Court granted by a memorandum opinion and order dated February 4, 1980.

■ At the outset, ICG contends that the stipulation of facts entered into by the parties and relied upon by the Court is not enforceable insofar as it precludes plaintiff from presenting facts and arguments relevant to a determination of the applicable rate. In effect, ICG's argument is that the stipulation cannot be binding if it prevents a carrier from collecting its lawful charges. These contentions lack merit given the context of this case. The stipulation entered into by the parties concerned the resolution of possible factual disputes as well as the narrowing of the scope of discovery. It in no way foreclosed from consideration the arguments presented by ICG on its behalf. Thus, the Court finds no basis for deviating from the well settled rule "[that] stipulations of fact fairly entered into are controlling and conclusive and courts are bound to enforce them." *United States v. 3,788.16 Acres of Land, More or Less, In Emmons County, North Dakota*, 439 F.2d 291, 292 (8th Cir. 1971); *Furniture Forwarders of St. Louis, Inc. v. Chicago, Rock Island and Pacific Railroad Company*, 393 F.2d 537, 539 (8th Cir. 1968). Since the parties' stipulation resolved all material issues of fact, the grant of summary judgment was appropriate under Fed.R.Civ.P. 56.[1]

■ With respect to the substance of the February 4 opinion, ICG argues that the Court misconstrued the requirements of Tariffs 604 and 804. On this ground, ICG seeks a new trial, amended findings, and an amended judgment. It is recognized, however, that

[M]otions made under Fed.R.Civ.P. 52(b) and 59(a) are not intended merely to re-litigate old matters nor are such motions intended to allow the parties to present the case under new theories. Instead, these motions are intended to correct manifest errors of law or fact or to present newly discovered evidence.

*Evans, Inc. v. Tiffany & Co.*, 416 F.Supp. 224, 244 (N.D.Ill.1976). ICG, however, has failed to present any new evidence in support of its motion. Nor has it pointed out any "manifest errors" in the Court's February 4 opinion. Rather, ICG's motion appears to be

no more than an expression of a view of the law contrary to that set forth in the Court's opinion. Whatever may be the purpose of Rule 59(e) it should not be supposed that it is intended to give an unhappy litigant one additional chance to sway the judge. Since the plaintiff has brought up nothing new—except his displeasure—this Court has no proper basis upon which to alter or amend the order previously entered.

Similarly, the matters ICG raises by this motion already have been fully litigated. This rehash of the arguments previously presented affords no basis for a revision of the Court's order.

■ Finally, ICG contends that primary jurisdiction in this type of case lies with the Interstate Commerce Commission ("ICC"). More specifically, ICG suggests that if the Court is inclined to rule adversely to its interest, it would be more appropriate to defer to the ICC—where plaintiff evidently believes its chance for success would be better. Resort to the ICC is proper whenever a rate is attacked as unreasonable or discriminating, or where technical words or phrases not commonly understood are employed. *Great Northern Ry. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 290–293, 42 S.Ct. 477, 478–479, 66 L.Ed. 943 (1922). However, the Court may resolve tariff issues when the

---

1. ICG's belief that the stipulation rendered summary judgment appropriate is reflected by its filing of a cross-motion for summary judg-

ment on the issue decided in the February 4 opinion.

task to be performed is to determine the meaning of words of the tariff which were used in their ordinary sense and to apply that meaning to the undisputed facts. That operation was solely one of construction; and preliminary resort to the Commission was, therefore, unnecessary.

*Great Northern*, 259 U.S. at 294, 42 S.Ct. at 480. Moreover, there are no issues such as cost-allocation which lend themselves to resolution by the agency possessing expertise is this area. *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 69, 77 S.Ct. 161, 167, 1 L.Ed.2d 126 (1956). The issues in this case involve tariff interpretation and construction, and as such properly can be, and were, adjudicated by the Court.

For the foregoing reasons, the Court neither will amend its findings and order nor will grant a new trial. Accordingly, ICG's motion is denied. It is so ordered.