**NORFOLK AND WESTERN RAILWAY COMPANY, Plaintiff–Appellant,**

v.

**B. I. HOLSER AND COMPANY et al., Defendants–Appellees.**

No. 79–1418.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1979.

Decided Sept. 8, 1980.

Larry R. Fisher, Lafayette, Ind., for plaintiff–appellant.

Lawrence C. DiNardo, South Bend, Ind., for defendants–appellees.

Before FAIRCHILD, Chief Judge, VAN DUSEN, Senior Circuit Judge,* and BAUER, Circuit Judge.

FAIRCHILD, Chief Judge.

Plaintiff–appellant Norfolk and Western Railway Company (hereinafter "N&WR" or "the railroad") sought to recover claimed undercharges on shipments of grain in interstate commerce. Defendants in the action are three shippers, B. I. Holser & Company of Walkerton, Indiana (hereinafter "Holser"), Argos Elevator, Inc. of Argos, Indiana (hereinafter "Argos"), and Wyatt Grain Company, Inc. of Wyatt, Indiana (hereinafter "Wyatt"). Also named as defendants are several consignees of the grain. The district court, after trial, found that the governing tariff was ambiguous, construed it favorably to defendants, and granted judgment to them.[1] We affirm.

The tariff applicable to the shipments at issue, from 1973 to 1976, is Central Territory Railroad Freight Tariff C/TN 245–1 (hereinafter "the tariff"), which was properly filed with the Interstate Commerce Commission (hereinafter "ICC"). The tariff provides for varying rates dependent upon the size of shipment; among the rates are the ten–car rate, found at Item 7011, and the five–car rate, found at Item 7058. The shippers were billed for and paid the ten–car rate which the railroad now claims was not applicable; the railroad seeks to receive the difference in charges between those set by the ten–car rate and those set by the more costly five–car rate. The crucial provision for this action is the switching restriction, applicable to the ten–car rate, in Item 7020.6 of the tariff:

> Rates will not apply when due to shipper's disability, assembly of shipment at origin requires originating line to switch more than one cut of empty cars to shipper's facility or more than one cut of empty cars from shipper's facility, or when due to consignee's disability distribution of shipment at destination, requires terminating line to switch more than one cut of loaded cars to consignee's facility or more than one cut of empty cars from consignee's facility.

N&WR and other railroads amended the tariff on July 1, 1978 as follows:

> A 'cut' is defined as a quantity (one or more) of cars delivered to or removed from the track or tracks of the consignor or consignee at origin and or destination at one location at one time. Such cars may be switched on, or pulled from, more than a single track.[2]

The trial court found that railroad representatives informed the shippers in 1971 that their facilities qualified for shipments under the ten–car rate. The statement in 1976 by an ICC investigator that these shippers did not qualify for the ten–car rate because they did not satisfy the switching

---

* Senior Circuit Judge Francis L. Van Dusen of the United States Court of Appeals for the Third Circuit is sitting by designation.

1. *Norfolk & W. Ry. v. B. I. Holser & Co.*, 466 F.Supp. 885, 890 (N.D.Ind.1979).

2. The clarification of the term "cut" was designated under ICC rules as explanatory, neither raising nor lowering rates under the applicable tariff.

restriction led the railroad to refuse further shipments under that rate from these shippers and led to this action.

The district court found the tariff ambiguous and resolved the ambiguities against the railroad. 466 F.Supp. at 891–93. Appellant argues that the tariff was not ambiguous and that its plain meaning favored the railroad's position. The railroad further claims that the district court based its ruling on matters properly within the primary jurisdiction of the ICC. Appellant urges that this court find improper the district court's adoption of findings of fact and conclusions of law prepared by the defendants and alleged to contain clearly erroneous material. Last, appellant urges that this court, in the event of reversal, decide as a matter of law that the affirmative defense of estoppel is not available to the shippers in this action.

The railroad cars involved in this action are jumbo covered hopper cars, each approximately sixty feet in length. N&WR contends that the ten–car rate is available only to shippers which, in addition to complying with the other terms of the rate, own or lease sufficient trackage, as part of their facility, to accommodate ten hopper cars at one time. This contention is based upon an interpretation of "shipper's facility" in Item 7020.6 to include only owned or leased trackage and to exclude trackage owned by the railroad but available through custom and usage to the shippers for use while loading cars. The district court rejected that interpretation, and concluded that "The terms 'shipper's facility' and 'track or tracks of the consignor' include that section of sidetrack set aside for and/or customarily used by the local elevator. There is no requirement that these sidetracks be owned or leased by the local elevator." *Id.* at 893. The district court has ably described, and we need not reproduce, the physical layout of the tracks and elevators in Argos, Wyatt, and Walkerton. *Id.* at 888–90. What is significant for our decision is that in each instance there was sufficient track (passing or side track, not the main track of the railroad) available for the railroad to make a single delivery of ten hopper cars to the shipper but that none of

the shippers owned or leased sufficient trackage on which to place and load ten hopper cars.

For all the grain involved in this action, it is clear that the shippers ordered ten cars per shipment. The district court found, and the evidence supports the findings, that the railroad rarely provided ten cars at a time. The failure to provide ten cars at a time caused the railroad to make multiple switches of cars to the shippers; it is obvious that these multiple switches were the result of the railroad's actions rather than the "shipper's disability" referred to in Item 7020.6.

█ Plaintiff argues that the district court trespassed upon the primary jurisdiction of the ICC. The Supreme Court has held that the ICC should have primary jurisdiction when it is necessary to have an "examination of the underlying cost–allocation which went into the making of the tariff in the first instance. . . ." *United States v. Western Pac. R. R.,* 352 U.S. 59, 69, 77 S.Ct. 161, 168, 1 L.Ed.2d 126 (1956). Similarly, the ICC has primary jurisdiction over the interpretation of disputed technical terms. Although the district court in the instant case referred to the rationales for the different rates provided in the tariffs, we do not consider questions of cost allocation to be significant in interpretation of this tariff for the purpose of this case. Nor is the term "shipper's facility" a technical term which the ICC's expertise enables it to interpret more competently than a court could do. *Penn Central Co. v. General Mills, Inc.,* 439 F.2d 1338, 1340 (8th Cir. 1971).

We recognize several rules of tariff construction:

[I]n interpreting a tariff, its terms must be taken in the sense in which they are generally used and accepted; . . . .
[T]he tariff should be construed strictly against the carrier since the carrier drafted the tariff; and consequently, any ambiguity or doubt should be decided in favor of the shipper. Such ambiguity or doubt must be a reasonable one and should not be the result of a straining of the language. . . .

[T]ariffs . . . should be interpreted in such a way as to avoid unfair, unusual, absurd or improbable results. . . . [A] strict construction of a tariff against a carrier is not justified where such a construction ignores a permissible and reasonable construction which conforms to the intentions of the framers of the tariff, avoids possible violations of the law, and accords with the practical application given by shippers and carriers alike.

*Penn Central Co. v. General Mills, Inc.,* 439 F.2d 1338–41 (citations omitted).

■ The term "shipper's facility" does not require that owned or leased track be deemed a part of the facility.[3] The context of the tariff does not settle the question. Several facts of record, or found by the court, support the district court's interpretation as reasonable.

The tariff, although expressly subject to the switching restriction, listed the locations of defendant shippers as points of origin from which shipments of grain could be made under the ten–car rate. In 1971 the railroad informed defendants these elevators were eligible for the ten–car rate. In the years involved in this case, the railroad continued to bill at the ten–car rate.

Although violation of a tariff does not alter the tariff, this court has held that agreement by shipper and carrier as to the meaning of the tariff strongly suggests that the meaning agreed upon was a plausible interpretation of the tariff, absent clear illegality by the parties: "The most powerfully persuasive argument that the tariff's inherent ambiguity permitted the interpretation followed by Hunt–Wesson is that all parties concerned initially agreed [regarding the meaning of the tariff later rejected by the railroad]." *Chicago & N. W. Ry. v. Hunt–Wesson Foods, Inc.,* 504 F.2d 905, 909 (7th Cir. 1974).

Although the term "track or tracks of the consignor" in the 1978 amendment does suggest that the consignor (the shipper) must have a possessory interest in those tracks, this amendment was made after the shipments involved in this case. It was indexed as making no change in the application of the ten–car rate and was directed primarily to defining the term "cut" rather than to clarifying the term "shipper's facility."

We agree that the district court's interpretation was appropriate.

■ This circuit has no rule forbidding a district court from adopting findings of fact entirely or substantially as proposed by one of the litigants. In reviewing such adopted findings, we recognize that they do not reflect the original products of a disinterested mind. *Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1284 (7th Cir. 1977).

Appellant argues about the requirements in Indiana for establishing adverse possession; this is an irrelevant issue because the trial court did not find that the shippers had obtained possessory rights in the side track or passing track on which the hopper cars were loaded. Next, appellant challenges the court's finding that the railroad rarely delivered ten cars at one time for the shipments at issue; we have indicated previously that this finding is supported by the evidence at trial, although there is contradictory evidence on this point. Although other errors are alleged, we do not find that the challenged findings of fact were clearly erroneous or, if erroneous, are material to

---

3. In a similar case, *Illinois Central Gulf Railroad Co. v. Tabor Grain Co.,* 488 F.Supp. 110 (N.D.Ill.1980), the court rejected the railroad's contention that the shippers had to have sufficient owned or leased trackage to accommodate twenty–five hopper cars. *Id.* at 118. In that case, the tariff provided for a 100–car rate with no more than four cuts. "Rates named herein will not apply when due to shipper's disability assembly of trains at origin requires Illinois Central Gulf Railroad to switch more than four cuts of empty cars to shipper's facility or more than four cuts of loaded cars from shipper's facility . . . ." *Id.* at 116. Although the court indicated that the term "shipper's facility" was not at issue in *Illinois Central, id.* at 116 n.12, the court decided on two grounds that the term was not restricted to owned or leased track. First was that nothing in the language of the tariff indicated the applicability of such a restriction. Second was that such a restriction could be drafted easily if it was intended, as shown by the 1979 amendment of the tariff to include such a provision. *Id.* at 118–19.

the proposition upon which we affirm, that the relevant terms of the tariff are ambiguous and are properly to be construed in favor of the shippers and consignees.

Because we affirm, we do not reach the question of whether estoppel would be an affirmative defense available to defendants if further proceedings were necessary.

Affirmed.